# THE JAY GOULD.

## (*District Court, E. D. Michigan.* March 10, 1884.)

**1. COLLISION—PROPELLER AND TUG-SIGNALS.**
A propeller and tug were approaching each other under signals of one whistle each, and in such relative positions that the propeller was exhibiting her red light to the tug. When about 600 feet apart, the propeller starboarded so far as to show her green light and shut in the red. The tug immediately blew two whistles, starboarded, and continued at full speed, and was struck by the propeller at a right angle and sunk. *Held*, that both vessels were in fault—the propeller for starboarding too far, and the tug for not stopping her engine.

**2. SAME—APPROACHING VESSEL—COURSE.**
A vessel approaching another is bound to pursue a consistent and steady course, and not to embarrass or confuse the other by unnecessary changes of her wheel.

**3. SAME—STEAMER—FAULT.**
Wherever by the fault of another vessel a steamer is placed in danger of collision, she is bound to stop or reverse, and will not be excused for a departure from the statutory rule, except upon clear proof that such departure was rendered necessary by the circumstances of the case, or that it could not have contributed to the collision.

In Admiralty.

This was a libel for a collision between the tug Martin Swain and the propeller Jay Gould, which took place about 3 o'clock in the morning of September 27, 1881, in the Detroit river, between the head of Bois

Blanc island and the main Canadian shore. At the head of the island are two range lights, by which vessels coming down the channel from the Lime-kiln crossing, so called, are accustomed to take their course until they turn down the channel between the island and the main land. Nearly opposite these lights, and about 250 feet from the main land is a red can-buoy, marking the easterly limit of the channel. The navigable channel, which at this point is about 1,000 feet wide, lies between the range lights and this buoy, and here the collision occurred. At this point the channel deflects about two points from a straight course, so that a steamer in coming down the river will exhibit her red light to an ascending steamer, while the latter exhibits her green light to the former, until after she passes the buoy. On the night in question the tug was proceeding up the river with the barges Marengo and Maria Martin in tow, and when opposite Amhurstburgh, made the red light of the Jay Gould descending the river. She thereupon gave a single blast of her whistle, to which response was made by a single blast from the propeller, and both ported a little and proceeded, with the understanding that each was to pass to the right, and upon the port side of the other. When they had approached each other within about 600 feet, the propeller's wheel was starboarded to go down the river, and she swung so far to port as to exhibit her green light to the tug, which immediately blew two whistles and put her helm hard a-starboard. The tug swung to port under this order about a point, when the propeller, whose wheel had been put hard a-port, struck her amidships on the starboard side, nearly at a right angle. In two or three minutes the tug stranded or sunk at the head of the island.

Upon the argument the court was assisted by Commander Cooke, of the navy, and Capt. Hackett, of the lake marine, sitting as nautical assessors.

*Moore & Canfield*, for libelant.

*H. C. Wisner*, for claimant.

BROWN, J. Much testimony was introduced upon either side, tending, upon the part of the libelant, to prove that the collision took place on the easterly side of the channel, and within two or three hundred feet of the red can-buoy; and, on the part of the claimant, to show that it must have occurred within a short distance of the head of the island, and upon the extreme westerly side of the channel. As usual, each crew swears almost as one witness to its own theory of the case, and in direct conflict to the other, each endeavoring to get his own vessel, as far as possible, toward its own side of the channel. We think, under these circumstances, it is much easier to extract the truth from the admitted facts and probabilities of the case than from any attempt to reconcile these contradictions or determine which of the two crews is more worthy of belief. Assuming that a tow bound up, with a light southerly wind, would naturally keep the center of the channel between Bois Blanc island and Amhurstburgh, we find nothing to in-

dicate that this was not the course actually pursued, except the fact that when opposite Amhurstburgh the tug met the tug Prindiville coming down with a tow, and passed her to the right. This would naturally incline the Swain somewhat to the starboard side of the channel. In support of his theory the learned advocate for the propeller insists that, inasmuch as the tug grounded and sunk at the head of the island, and a little to the west of the ranges, and was keeled over on her port side, she must have received the blow very near there, and was propelled by the immense weight of the propeller to the spot where she was sunk, and was driven over on to her port side. There is much plausibility in this suggestion, as the wound in the side of the tug was a very deep one, and it is impossible that she could have been kept in motion long after the propeller's bow was withdrawn from her side. Upon the other hand, the engineer and some of the tug's crew swear that the coal bunkers, which were against the spot where the propeller struck the tug, prevented the water rushing in with great rapidity, and allowed the engine to be kept in motion long enough to carry the tug some two or three lengths until she grounded at the head of the island. We think this was not impossible. The difficulty with the propeller's theory is that it compels us to believe that the tug executed the wholly inexplicable and improbable maneuver of starboarding and crossing the channel to the wrong side after she had signaled the propeller that she would port and keep to the right. The master of the tug was born at Amhurstburgh; had sailed for 20 years; knew every foot of the river at that point; and we would not believe him guilty of so gross an error without the most convincing testimony of the fact. Upon the whole, we think the collision occurred very near the center of the channel.

We do not, however, deem this question of vital importance, as we are all agreed that the propeller was guilty of fault in exhibiting her green light to the tug, after signals of one whistle had been exchanged between them. The propeller was coming down the channel, exhibiting her red light to the tug. Good seamanship and her signals both required that she should pursue a consistent course, and exhibit her red light, and her red light only, until she had gotten abreast the tug. Assuming that she must leave the ranges and starboard a point or two to take her course down the river, she had no right to swing so far to port as to exhibit a green light to the ascending tug. It was a movement which could not fail to embarrass and confuse the master of the Swain, and was, in our opinion, the primary cause of the collision which ensued. Even if the tug was on the westerly side of the channel, as the propeller insists, and the propeller starboarded her wheel to prevent running upon the island, she was still in the wrong, as she should have stopped long enough to permit the tug to pass her, instead of starboarding so far as to exhibit her green light. We have no doubt that she swung further to port under this order to starboard than her master intended, and that

the accident was due to the bad steering qualities of the propeller. The admissions of her wheelsman, made at Buffalo, that she first swung too far to port, and then too far to starboard, after she recovered herself, are strongly corroborative of this theory. Knowing, as her officers were bound to know, this defect in the propeller, we think it was clearly their duty to have provided against it, and kept so far away from the tug as to prevent the possibility of this occurrence.

The question as to the liability of the tug is a much more difficult one, and depends entirely upon the conduct of her master after the propeller had swung to port so far as to shut in her red and exhibit her green light, and the danger of collision had become imminent. Some minutes prior to this the two vessels had exchanged signals of one whistle, and where proceeding with a perfect understanding that each was to pass upon the port side of the other. The sudden starboarding of the propeller, and the exhibition of her green light, were calculated to create an uncertainty in the mind of Capt. Tormey as to the intention of the propeller. He might draw the inference either that the propeller had starboarded to go down the channel between Bois Blanc island and the mainland, as was actually the fact, or that she had repudiated the understanding, and was endeavoring to take a new course down on the starboard side. Acting upon this hypothesis, he blew two whistles, and starboarded. This would have been a proper maneuver had the intention of the propeller been as he supposed; he was mistaken, however, and the maneuver brought about the collision it was intended to avoid. His proper course was to comply with rule 3 of the Supervising Inspectors, which reads as follows:

Rule 3. "If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

The same obligation to slacken speed is contained in the twenty-first sailing rule of the Revised Statutes, (section 4233,) in the following terms:

"Every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse."

As it is substantially agreed that the propeller was only about 600 feet off when her green light was exhibited, it is at least open to doubt whether the action of the tug did, in fact, contribute to the collision, and whether any maneuver upon her part could have prevented it. The gentlemen by whom I have been assisted upon the argument advise me that, in their opinion, the vessels were then too close together for any efficient action upon the part of the tug. But

to exonerate her for her departure from the rules I apprehend that it must be shown with reasonable certainty that such departure could not have contributed to the disaster which followed. The rule is entirely well settled, both in this country and in England, that the violation of any statutory requirement will be presumed to have contributed to the collision. Thus, in the case of *The Pennsylvania*, 19 Wall. 125, where a bell was rung by a sailing vessel under way in a fog, when the rule prescribed that a fog-horn should be blown, Mr. Justice STRONG, speaking for the supreme court, observes:

"That when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was, at least, a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not* have been. Such a rule is necessary to enforce obedience to the mandate of the statute. * * * The evidence in the present case leaves it uncertain whether, if a fog-horn had been blown on the bark, it would not have been heard sooner than the bell was heard, and thus earlier warning have been given to the steamer—seasonable warning to have enabled her to keep out of the way. * * * It may be assumed, therefore, that the legislature acted under the conviction that a fog-horn could be heard a greater distance than a bell, and required the use of one rather than that of the other for that reason. To go into the inquiry whether the legislature was not in error—whether, in fact, a bell did not give notice to the steamer that the bark was where she was as soon as a fog-horn would have done — is out of place. It would be substituting our judgment for the judgment of the law-making power."

The obligation to slacken speed whenever by a false maneuver on the part of another vessel a steamer incurs the danger of collision, has been enforced in numbers of cases, and under circumstances very similar to those which existed in the case under consideration. *The Huntsville*, 8 Blatchf. 228, 231; *The Comet*, 9 Blatchf. 323, 329; *The Ogdensburg*, (*Chamberlain* v. *Ward*,) 21 How. 548, 560; *The Manitoba*, 2 Flippin, 241, 255. By far the most exhaustive discussion of this question is contained in the judgment of the house of lords in *The Voorwarts and Khedive*, L. R. 5 App. Cas. 876. This was a collision in the straits of Malacca. The two steamers were heading upon nearly opposite courses, and appeared about to pass each other safely, green light to green light; but when they were about half a mile apart the Voorwarts suddenly ported her helm and threw herself across the bows of the Khedive and rendered a collision imminent. The captain of the Khedive ordered the helm to be put hard a-starboard and the engineers to stand by the engines. Two minutes afterwards he ordered them to stop and reverse; and a minute and a half afterwards the collision took place. The judge of the admiralty court held that both vessels were in fault. The court of appeal found the Voorwarts solely to blame for the collision, and reversed the judgment of the admiralty court. The house of lords reversed the judgment of the court of appeals and restored that of the admiralty court,

their lordships holding generally that it was the duty of the Khedive to stop and reverse as soon as the Voorwarts threw herself across the bows of the Khedive, notwithstanding the fact that it was shown that the master had acted with ordinary care, skill, and nerve as a seaman, and stopping and reversing at once would not have prevented the collision. It is true that this case was decided under section 17 of the merchant-shipping act of 1873, which declared that "if in any case of collision it is proved to the court before which the case is tried that any regulation for preventing collisions contained in or made under the merchant-shipping acts, 1854 to 1873, has been infringed, the ships by which said regulation has been infringed shall be deemed to be in fault, unless it is shown to the satisfaction of the court that the circumstances of the case made departure from the regulation necessary." I think, however, this statute does not vary the rule laid down in the case of *The Pennsylvania, supra,* to any appreciable extent. Their lordships acted upon the opinion of the court of appeal, that the Khedive was not to blame until after the collision was imminent, or, perhaps, inevitable. The court held generally that it was the duty of the Khedive to have stopped and reversed her engines, and that there was nothing in the circumstances rendering a departure from the rule necessary to avoid immediate danger; and that even if it would be, in the absence of a positive rule, proper seamanship to keep way on the ship in order to make her more manageable, which was not clear, the legislature had thought it better to prescribe the course which must be followed. Lord WATSON, in his opinion observes:

"It appears to me that it was the deliberate policy of the legislature to compel sea captains, when their vessels are in danger of collision, to obey the rule, and not to trust to their own nerve and skill; and that it was an essential part of the same policy to admit of no excuse for non-observance of the rule, short of satisfactory evidence, either that the captain was constrained to disobey it by other perils of the sea or that he adopted a course which, in the circumstances, was better than that prescribed by the rule. And, for my own part, I cannot think the legislature has acted unwisely in applying a uniform statutory test to all such cases, instead of leaving them to be decided by the variable test of '*fault,*' as ascertained in each case, with the aid of nautical opinion."

The same rule was applied to the non-exhibition of lights by the privy council in the case of *The Hochung and Lapwing,* L. R. 7 App. Cas. 512.

There are cases, it is true, in which a master is justified in continuing at full speed even though a collision be imminent; but they are rare and depend upon circumstances wholly exceptional. Such a case was presented at the last term in *The Colwell and Joy,* where a tug having three vessels, with their sails up, in tow, was proceeding down Lake Erie, with a favorable wind, and met another tow coming up, which attempted to cross the bows of the former. We held in this case that the tug was justified in proceeding at full

speed, both because it was her duty to pull her own tow as far away from the other as possible, and because the force and direction of the wind was such that a collision with her own tow would have been almost inevitable in case she had stopped; but it must be made to appear beyond a reasonable doubt, in all cases where the twenty-first rule applies, that the failure to stop or reverse was demanded by the special circumstances of the case, and that collision would in all probability have occurred had the statutory course been pursued. It would be exceedingly dangerous to allow the masters of steam-vessels to exercise their best judgment in all cases in determining whether or not the statute should be obeyed, although we understand this to be the general practice upon the lakes. This is substantially held in the cases above cited. The better rule is to hold the master in fault for the disobedience of the statute in every case where he cannot make it appear that a departure was imperatively demanded.

In the case under consideration, while I differ from the nautical assessors with great hesitation, I am not entirely prepared to concur in their opinion that the collision would still have happened had the tug kept her course and stopped her engines. Considering that the propeller had time, not only to recover from her swing to port, but to swing so far to starboard as to strike the tug at nearly a right angle, although the tug herself swung only one point to port, it seems to me that if the tug had kept her helm and stopped her engine she would have swung clear of the propeller, and the disaster would have been averted. As the tow was proceeding against a current of two or three miles an hour with sails furled, there would have been little, if any, danger of fouling the tug or each other. I have not over-looked, in this connection, the many rulings which hold that an error of the master committed at the moment of collision is not a fault. Such an error is pardonable upon the theory that the master may resort to any maneuver to ease the blow. But I am not aware of any case which holds that a steamer may continue at full speed, unless she can show *beyond a reasonable doubt* that the collision was then inevitable.

There must be a decree adjudging both vessels in fault, and refer-ring it to the clerk as commissioner to assess the damages.