LA CHAMPAGNE.

SEWALL et al. v. LA CHAMPAGNE.

(Circuit Court of Appeals, Second Circuit. February 27, 1894.)

No. 58.

1. COLLISION—LIGHTS—EVIDENCE.

Testimony of the officers and lookouts of a steamer that no green light was seen on a schooner until just before collision, and that the light was afterwards examined and found to be dim and insufficient, *held* to overbalance the evidence of the schooner's witnesses that the light was properly set, sufficient, and burning brightly. 43 Fed. 444, affirmed.

2. SAME—SCHOONER MISTAKEN FOR PILOT BOAT—SPEED.

A steamship approaching New York harbor saw a torch burned ahead or a little on her port bow, slightly above which appeared, at intervals, a white light like the masthead light of a pilot boat. Supposing it to be such, the steamer burned a torch as a signal for a pilot, and thereafter another torch was burned on the stranger, which was taken for an assent. Being misled as to distance by the small space between the torch and the supposed masthead light, the steamer, after changing her course a point to starboard, continued at 13½ knots, until she came suddenly upon the stranger, which proved to be a schooner with an insuffi-

cient green light, and a collision ensued. *Held*, that the steamer was not in fault for mistaking the schooner for a pilot boat, or for maintaining her speed under the belief that the latter would maneuver to bring to on her lee side. 43 Fed. 444, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

These are cross appeals from a decree of the district court, southern district of New York, made on February 14, 1893, awarding libelants one-half the damages sustained by their schooner through a collision with the steamship La Champagne, which occurred about 5:30 a. m., February 25, 1890, on the Atlantic ocean, 25 miles to the southward of Shinnecock light. Both vessels sustained damage, and the district judge held them both in fault. 43 Fed. 444.

Jones & Govin (Edward K. Jones, of counsel), for appellants.

Owen, Gray & Sturges (F. D. Sturges and E. L. Owen, of counsel), for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The schooner was bound from Darien, Ga., to Bath, Me.; the steamer, into the port of New York, from Havre. According to the libelants' contention, the schooner was sailing under reefed sails on a course about N. N. E. by her compass, making from three to four knots an hour. The weather had been foggy, and at the time of the collision had partially cleared, so that lights and objects could be seen at a considerable distance. It was the mate's watch, and he was on deck, with a man at the wheel and another on lookout. The masthead light of the steamer was discovered four or five miles distant, bearing, as the libel says, "off the schooner's starboard bow," and subsequently the steamer's red light came into view about two miles distant, and bearing abaft the schooner's starboard beam. The mate watched the red light for a while, and, believing the schooner was not seen, burned a torch to the leeward of the mainsail. Subsequently, by directions of the captain, he burned a second torch, and, while it was burning, the captain came on deck. After this second torch, as the schooner's witnesses testify, the steamer burned one. When about a mile and a quarter off, both colored lights of the steamer appeared, heading directly for the schooner. The steamer's hull shortly appeared, heading towards the schooner, whereupon a gun was fired on the latter. The steamer then ported her helm, shutting out her green light, and, coming on with little, if any, diminution of speed, struck the schooner forward of her fore rigging on the starboard side.

The district court held the schooner in fault for having an "insufficient green light." The witnesses for the schooner testified that both lights were properly set, sufficient, and burning brightly. All the officers and lookouts from the steamer testified that no green light was seen on the schooner while the vessels were approaching, except that the steamer's captain thought at one time that he could make one out. The steamer's witnesses also testify that

immediately after the collision the green light was examined, and found to be burning so dimly that it could hardly be seen. We do not find in the case anything which will warrant our disregarding the conclusion of the district judge upon that disputed question of fact, especially as an examination of the evidence has failed to convince us that the steamer approached the schooner astern of the range of her lights. "All agree," says the district judge, "that the steamer was first seen forward of abeam. The pleadings say, '[off] the starboard bow.' With that simple fact, and with the steamer's speed of 13½ knots, and a course such as to expose her red light only, I find it impossible for the steamer to have got two points astern of the schooner's beam, so as to be out of the range of the schooner's green light, as the witnesses of the latter testify she was." To this argument we find no satisfactory answer in the pleadings or the proof. The libel makes no suggestion that the steamer's masthead light, when first seen, was abeam, and the testimony from the schooner to that effect has all the appearance of an afterthought. The decision of the district judge holding the Belle Higgins in fault for having an insufficient green light is therefore sustained.

The evidence from the steamer shows that she was going at a speed of 13½ knots, her full speed being 17½, on a course S. 59 W. magnetic. Competent and efficient officers were on her bridge, competent and attentive seamen on the lookout. The first seen of the schooner was a torch light, either ahead or a little on the port bow. It was inferred that it was that of a pilot boat, and, as La Champagne was in search of a pilot, she burned a torch herself on her port side to indicate that she wished to take one. All the witnesses from the steamer who gave evidence as to the burning of her torch, save one, testify that it was burned prior to the schooner's second torch. The master and mate of the schooner testify that the steamer's torch was not burned until after the schooner had burned two; but the wheelsman on the schooner corroborates the statement of those on the steamer that her torch was burned after the schooner's first, and before her second, one. The district judge has expressed no opinion as to the order in which these torches were burned. The weight of evidence seems to us strongly to support the contention of the steamer, and, in the absence of any expression of opinion upon that point by the judge, who saw the witnesses, we have reached the conclusion that, subsequently to the burning of the steamer's torch, one was burned by the schooner. With the exception of the captain, who, very shortly before collision, thought he saw a green light, and asked the second captain, a man of excellent eyesight, if he saw it, all the witnesses from the steamer testify that they saw no colored lights on the schooner before collision. The officers of La Champagne, moreover, testify that they saw a white light, not visible continuously, but which "disappeared from time to time, exactly like the lights on pilot boats which are hidden by masts and by the sails, the same as if a vessel were heaved by a swell or a wave." They further testify that, when the torches were burned on the schooner,

this white light appeared but a little distance above them, whereupon, supposing it to be the masthead light of a pilot boat on station, they inferred that the vessel displaying it was a long way off. The steamer's course on first sighting was changed one point to starboard, and, having signaled with their torch for a pilot, and received, as they supposed, an assent by the second torch burned on the schooner, the commandant telegraphed "Attention" to the engine, and gave directions to prepare the ladder and the lantern to take the pilot on board. La Champagne continued on her changed course at the same speed until the explosion of the gun on the Belle Higgins disclosed her sails, and that she was "cutting off the steamer's course perpendicularly." Thereupon her course was changed hard to starboard, engines reversed, and put full speed astern. Nevertheless, the vessels came in collision.

The district judge held the steamer in fault because (1) she mistook the schooner for a pilot boat, and (2) did not sooner reduce her speed.

There was evidence from some of the witnesses called by the steamer that at or immediately prior to the collision they saw a lighted lantern on the schooner's after house. Another of them (who went on board the schooner with the steamer's captain) saw a lantern there after the collision, and was instructed to put it out, as well as the side lights, when the schooner was abandoned. The captain of the schooner admitted that there was a lighted lantern on board, but said it was in the oil room until, after collision, it was brought out to read the steamer's name by. Whether or not there was such a light on the after house while the vessels were approaching each other is an issue the district judge does not express any opinion upon. He does hold that "there was no light on the schooner that could possibly present the appearance of the white masthead light required of pilot boats by the rules of navigation." The weight of evidence seems to indicate that there was a lantern on the after house. Certainly, unless the testimony of the steamer's officers is to be wholly discredited (and the district judge did not discredit them), they saw something luminous on or about the schooner, other than the torches or the invisible green light. The district judge reached the conclusion that, whatever it was which was thus visible to them, it "cannot be deemed to have been justifiably confounded with a pilot's masthead light." In this part of the case we are dealing, not with a fault of the schooner, but with the question whether the navigators of the steamer had sufficient grounds for their mistaken belief as to the character of the schooner. There is nothing to indicate that they have deliberately fabricated the statement that they saw an intermittent white light. The district judge credited their evidence generally. That they were competent and experienced mariners is practically conceded. That they were watchful and vigilant, scrutinizing the approaching vessel carefully, is hardly disputed. That they believed what they saw to be the masthead light of a pilot boat on station is abundantly established. Not only do they testify to such belief, but their entire conduct in making preparations for receiving a pilot aboard con-

firms such testimony. When several competent mariners, who, in the course of a long experience in ocean navigation, have become accustomed to see probably hundreds of masthead lights on pilot boats, in all conditions of wind and weather, reach concurrently the conclusion that a light which they see and carefully observe is such a light, a court is reluctant to substitute its judgment, upon appearances it has not seen, for theirs. Moreover, we must assume that the mistake which the officers of the steamer made as to the character of the schooner would have been corrected before the former had advanced beyond the safety limit between the two, had the schooner displayed a sufficient green light to be observed by those who were watching her. Thus the schooner's fault induced the continued belief that she was a pilot boat, even if, as her witnesses say, the lighted lantern was in the oil room. But, as stated above, we think the weight of testimony is that it was on the after house. The burning of a torch by the schooner after the steamer had burned one naturally confirmed the belief as to her character, such signal being the recognized one agreeing to send a pilot aboard in compliance with the steamer's request. It would not be expected that an overtaken vessel, whose first torch had evidently been observed, since the steamer herself had signaled, would immediately burn another. We are of opinion, therefore, that the error of judgment by the officers of the steamer touching the character of the schooner was not a fault for which respondent should be held liable.

This conclusion practically disposes of the other fault attributed to the steamer, viz. that she did not check her headway sooner. She did stop and reverse at full speed, immediately upon discovering, by the illumination which accompanied the firing of the schooner's gun, that the latter was not maneuvering to come alongside and put a pilot aboard, but was crossing the steamer's course from port to starboard. But it is claimed that she should have slackened speed sooner, even though she supposed the schooner was a pilot boat which had assented to her request to send aboard. The officers of the steamer who saw the intermittent white light say that it appeared such a short distance above even the second torch that, supposing it to be at the masthead, they inferred the schooner was a long distance off. They changed direction a point to starboard in order to put the schooner a little more on the port hand, and thus make it more easy for the pilot to come up to the steamer. They continued on at the reduced speed of 13½ knots, postponing further maneuvers till the vessels should be nearer to each other, and supposing they were approaching a vessel which had a common purpose with themselves, viz. to approach near enough to the proper side of the steamer to send a pilot aboard in a small boat. Before condemning the steamer for thus keeping on, when the circumstances justified a belief that the other vessel was not a sailing vessel, bound, under the rules, to keep her course in presence of a steamer, but was one which had agreed to co-operate in maneuvers appropriate to accomplish the common purpose, the court should be satisfied that the failure to diminish speed was a maneuver dan-

gerous even had the schooner been really what she seemed. Of this we are not satisfied. Because she collided with a schooner required by the twenty-second rule to hold her course, it by no means follows that she would have collided with a pilot boat not so required by rule, and which had agreed to a maneuver that did not contemplate her crossing the steamer's course. In this connection the direction of the wind is a material circumstance to be considered. The district judge makes no finding as to its direction. "The wind, as [the schooner] claims, being light from the S. W.," is the only statement on that subject in the opinion. Two witnesses from the deck of the schooner testified before the answer of the steamer had indicated its theory of the collision. One of these, the steward, "couldn't tell the direction of the wind;" the other, the helmsman, testified that he "couldn't tell the direction, but that it was on the port side and more aft," "on the quarter," and that the schooner's sheets were not off. The mate of the schooner, who testified on the trial, was not asked as to the direction of the wind. Her captain, who also testified on the trial, had left the deck at 4 a. m., before which time, as he said, the wind had been "southeast, foggy and thick," but was then "hauling away," and he expected a strong northwester. He was not asked as to the direction of the wind when, on the mate's report of the approaching steamer, he again came on deck. The captain of the steamer, however, puts the wind at W. N. W., insisting that his recollection is perfectly clear that he had the wind continuously, even after he had changed his course one point to starboard, on the starboard hand. The second captain says that before the change of course the "wind came from about four points from the starboard hand." The other witnesses on both sides were not questioned on this point, which seems not to have been especially contested on the trial. From such evidence as there is we have reached the conclusion that the port side of the steamer was her lee side. As it is the custom of pilots to come aboard on the lee side, and as the schooner was already on the lee side, it was to be anticipated that, if she were a pilot boat, she would run on until a little on the lee bow, and there come to. That she would keep on across the bows of the steamer was not to be anticipated. Under all the circumstances of this case, we do not think the steamer is chargeable with fault for not sooner reducing speed. The case is materially different from The City of Washington, 6 Ben. 146, Fed. Cas. No. 2,770; Id., 11 Blatchf. 487, Fed. Cas. No. 2,771.

We are not satisfied that by coming to port, instead of to starboard, when the explosion of the gun disclosed the character and course of the schooner, the collision would, as libelants claim, have been avoided.

The decree of the district court is therefore reversed, with costs of appeal, and cause remanded to that court with directions to dismiss the libel, with costs.