THE DAYLIGHT.

THE CIRCASSIA.

ARMSTRONG et al. v. BARROW STEAMSHIP CO.

FOSTER v. THE CIRCASSIA et al.

(Circuit Court of Appeals, Second Circuit. April 7, 1896.)

COLLISION—STEAMER AND SAIL—SAILS OBSCURING LIGHTS—EVIDENCE.

Two lookouts, two navigators, and the wheelsman of a steamer all testified that they were vigilant, but failed to see the green light of a schooner until too late to avoid collision, and even then only saw it dimly at first. It was conceded that the light was in place, and properly burning. The relative positions of the vessels, the length of the schooner's forestay sail boom, and the spread of the staysail were such that, with a list to starboard, and the bellying of the sail, the light might have been obscured. *Held*, that it was more probable that such was the case than that all the witnesses aforesaid should have been negligent or mistaken or untruthful in their testimony, and that the schooner should therefore be held solely in fault. 55 Fed. 113, affirmed.

Appeals from the District Court of the United States for the Southern District of New York.

Three libels were filed to recover damages arising from a collision which happened about 10 p. m., September 26, 1891, in the Atlantic Ocean, about 80 miles to the eastward of Sandy Hook, between the steamship Circassia and the schooner Daylight. The first two actions were brought by the owners of the respective vessels to recover damages claimed to have been sustained by each. The third action was brought against both vessels by the shipper of a quantity of apples on board the Circassia, claimed to have been damaged by detention of the steamer caused by the collision. The district court held the Daylight solely in fault (55 Fed. 113), and she has appealed.

Edward L. Owen and W. W. Goodrich, for the Daylight.

Harrington Putnam, for Barrow Steamship Co.

George A. Black, for Chas. Foster.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The opinion of the district judge is exhaustive, and sets forth in detail the movements of the respective vessels. Inasmuch as there is less dispute than usual on this branch of the case, and the appellant's argument practically charges error in the findings of fact only in those particulars which relate to the position of the schooner's forestay sail, it is unnecessary to discuss the testimony in detail. The schooner was sailing on the port tack, on a course of about S. W., with the wind two points abaft the beam. The wind was light to moderate, estimated by her officers as about a six-knot breeze, although she had since 6:30 p. m. covered a distance which would make her speed for the three hours, preceding the collision considerably higher. The steamer was going at a speed of about 11 knots, on a compass course of E. ¾ S. The schooner first sighted the steamer's white light and red light on her starboard bow at a distance of two miles or more. This indicated that the steamer was crossing the Daylight's bow. No change being made in the steamer's course, and the vessels draw-

ing nearer together, the schooner burned a flash light, and just as it expired, the distance between the vessels being then a quarter of a mile or less, put her helm hard a-port. The steamer had one lookout on the stem, one on the lookout bridge, and the chief and third officer, who had charge of the navigation, on the main bridge, besides the quartermaster at the wheel underneath the main bridge. They did not perceive the schooner until she burned her flash light. After the dazzling effect of the flash had passed away,—a very few seconds only,—a green light was seen, which the steamer's witnesses say appeared "dull," "dim," or "glimmering." This was undoubtedly a very short time before collision, and as soon as it was seen orders were given to starboard the helm, and to stop the engines, and to put the same full speed astern. We need not discuss the evidence bearing upon the question as to which vessel first changed direction, or as to the ensuing maneuvers. The fault of neither vessel lies there. It lies much further back, and arose when the steamer failed to detect the presence of the schooner while the distance between the two was still sufficient to admit of such a change in the steamer's course as would give timely notice to the Daylight that her course was known, and would not be intersected by the Circassia. In other words, the vital question in the case is, "Why was not the schooner's green light seen in time?" It was a proper and sufficient light. All parties concede that. The appellant contends that all of the persons on the deck of the Circassia—lookouts, navigators, and wheelsman—failed to see it because they were not vigilant or attentive. They all testified and all insisted that they were vigilant. The steamer contends that the schooner's green light was obscured by the forestay sail. The witnesses from the schooner's deck all testified and all insisted that it was not so obscured. She was sailing on a course which would naturally bring her forestay sail as near as its cut, rig, and tackle would allow to the starboard light. Testimony was taken in the district court as to measurements and experiments made subsequently, and the judge reached the following conclusion:

"There were five persons on the steamer who were in a position to see the schooner's green light, four of whom ought to have seen it, if it was visible, before the torch light was exhibited. The interval was a considerable one. The night was not bad for seeing lights; and, if it was visible, nothing but simple negligence could have prevented its being seen. There is nothing to indicate that the officers were not reasonably vigilant and attentive to their duties. Under such circumstances, failure to see the light has been frequently held to be strong evidence that the light was not visible, and this ought to be deemed sufficient where, as in this case, there appears to have been a reasonable and sufficient cause for the obscuration of the light. The length of the forestay sail boom and the spread of the staysail were such that, with a list of the vessel to starboard, and the bellying of the sail, the green light might have been obscured when the vessels were in such relative positions as these. The only check to the obvious tendency to obscure the light would be scant play allowed the staysail sheet. But, even as the evidence stands upon that point, it does not seem to me that this would necessarily prevent obscuration."

The conflict of evidence necessarily left the case to be determined upon its inherent probabilities, and it seemed to the district judge

much more probable that the staysail did obscure the light to distant observers, than that all those on the deck of the steamer navigating directly across what was well known to be the track of a large fleet of coasting vessels were continuously negligent for a considerable space of time. This is an entirely reasonable disposition of the question, unless something which was overlooked in the case below, or something which is to be found in the new proofs, is persuasive to a different conclusion.

It is contended by the appellant that there are such discrepancies in the testimony of the steamer's witnesses as to what they saw immediately after the flash light as to cast discredit on their testimony that they were vigilant. An examination of their evidence does not lead us to this conclusion. Campbell, the lookout in the stem, on the forecastle head, after seeing the flash light on the port bow, saw the loom of the schooner's sails, and when very close saw her red light on the starboard bow. He furthermore says that he does not think he saw a green light, because it was a good while since, although he is not very sure about that; thinks he might have seen it; a blink of the green light off the port bow. Duffy, the second lookout, was on the lookout bridge, 7½ feet above the deck and 70 feet aft of the stem. He stood, therefore, more to leeward of the Daylight than Campbell did. He saw the flash light off the port bow, and a little after the green light. "About thirty seconds before collision" he saw the red light on the starboard bow, a very little ahead. This witness was examined upon written interrogatories in San Francisco,—not always a very satisfactory method of eliciting testimony,—and his story as to what he saw subsequent to the first appearance of the green light is somewhat confused, but we do not find in it, as appellant contends, a contradiction of the other witnesses as to the green light being seen, at some time before collision, off the starboard bow. The chief officer and the third officer first saw the green light from the port side of the main bridge, nearly 60 feet aft of the lookout bridge. They were, therefore, still further to leeward of the Daylight than Duffy or Campbell. The chief officer made it out with the naked eye, but the third officer only with the glasses. McDonald, the wheelsman, saw the flash light off the port bow. He is not very positive or definite as to when or where he saw other lights, but, as his attention was given to the wheel, this is not surprising. We find nothing in all this testimony to cast discredit on the steamer's theory of obscuration. Nor is the fact that the green light soon became bright to those on the steamer fatal to this theory. If, when first seen, it was not visible to the lookout in the stem, but was visible, though dimly, to those a little further to leeward, that fact would indicate that the interposed sail, if that was the cause, extended so little beyond the line of light that a trifling change in its position would remove the obscuration, and on the course the schooner was sailing a very slight change of her head to leeward would becalm the forestay sail sufficiently for it to come inboard enough to clear the light.

The appellant relies principally, however, on the evidence as to

measurements of and experiments with the forestay sail and its appurtenances. When the case was on trial in the district court, the last witness called by the Circassia was Vining, a port inspector, who visited the Daylight when she was lying in Brooklyn for repairs after this collision. He found the forestay sail furled to the boom, and the boom hanging by a topping lift from the mast, the boom lying amidships, and just swinging clear of the foremast. This witness undertook to testify to the length of the boom, height of the hounds from the deck, beam, and distance of the lights (which were fixed on the shrouds) inside the rail. It appears, however, that these were not all made with a tape line or other measure, but were estimated roughly. They cannot be accepted, therefore, as accurate. He testified that from what he saw he "judged" that, if the boom was out, say three points, off three points, the after-end of the boom would be about a foot inside of the rail, provided the rail ran straight without the curve that forms the bow of the vessel; and about a foot outside when the vessel narrows as she goes forward. He added that if the boom was off three points it would obscure the green light to an observer off the starboard bow. Vining's examination of the ship was on October 16, 1891, and his testimony was given on the trial in January, 1893. Thereupon the captain of the Daylight was recalled; the mate, who joined her in October, 1892, testified; and the Circassia was allowed to examine one Freeman, a port warden in Baltimore, who examined the Daylight, January, 1893, while lying in that port. Additional testimony was taken in this court. The Daylight called one of her owners (Manson) and a sea captain (Randall) to testify to measurements and experiments made in November, 1895, and an expert rigger (Low) who answered hypothetical questions based on such measurements. The Circassia called a sea captain (Eldridge) and an expert rigger (Scott). The result of all this testimony may be briefly stated. It is usual for schooners such as the Daylight to have their forestay sail so rigged as to keep the forestay sail boom "about abreast of the rail, or generally a little inside." After this accident, the Daylight shipped a new forestay sail boom. This was evidently after Vining's examination, for he found a boom which had been cracked and fished. The new boom is 21 feet 3 inches long, and clears the foremast by 1 foot. The old boom, as the captain testifies, when amidships, came within 3 inches of the foremast, or, as Vining expresses it, "just swung clear of the foremast." She also bent on a new forestay sail. This was meant to be the same size as the old one, but as late as 1893, when Capt. Nickerson testified, it had not got stretched out yet, and was "about a foot shorter on the foot" than the old one. The lights are still on the rigging where they were in 1891. The beam of the vessel at that place is 33 feet, and the distance between the lights 27 feet 11½ inches. The "tumble-in" of the shrouds therefore brings each light 2 feet 6¼ inches inboard. The sheet of the forestay sail, as is usual on such vessels, is rove through two single blocks on deck and a double block on the boom. A knot is made near the free end of the sheet to prevent it

from running through the block. It is manifest that the extent to which the boom and sail can move to starboard or port depends entirely on the length of this sheet from the place where it is made fast to the knot. And it is usual on such craft, as the expert rigger called by the Daylight testified, to keep the sheet short enough to keep the boom about abreast of the rail, or generally a little inside. Freeman, in January, 1893, found that the boom, without the sail set, would not swing nearer to the inside of the rail than 3 feet 6 inches, and that with the sail set and swayed up taut the boom would not come nearer than 6 feet 9 inches to the rail. Manson and Randall, in 1895, experimented with the end of the boom at various heights above the deck, and the furthest they could swing the boom off to starboard was 6 feet 3 inches inside of the rail. If this was the limit of its swing, the forestay sail would not obscure the starboard light. But a chain is no stronger than its weakest link, and no amount of subsequent measurement or experiment, no matter how careful and detailed it may be, will change the case from that made in the district court, unless it be shown that all the conditions attending the experiment were the same as they were at the time of the collision. Evidently the new boom is shorter than the old. The captain, it is true, testified that both were of the same length, but he had evidently no very accurate idea of the length, for he gave it as 16 feet, and the new boom is conclusively shown to be 21 feet 3 inches. Certainly it does not come as near to the foremast as the old one did. Randall and Manson found a sheet 45 feet long. They unrove it, and substituted, for the purposes of their experiments, a rope 57 feet 4 inches in length. Freeman conducted his experiments with the sheet he found in use, which he measured, and ascertained to be 57 feet 4 inches long; i. e. from the knot to the end that was made fast. This examination of Freeman's, however, was about the end of January, 1893, nearly 18 months after the collision. When we turn to the record for evidence that the same sheet, with the knot in the same place, or a sheet of the same length, was in use on the night of the collision, we find the testimony of the captain only. He testified in January, 1893, "We have got the same sheet we had then, and the same knot in it." It is the mate's duty to look after changing, shifting, or putting in new sheets or new ropes, but he reports to the captain before putting in new ones. It does not appear that a mate might not alter the position of a knot in a sheet without orders or without reporting. The case resolves itself, then, into a question of relative probabilities. Which is the more probable, that the captain was mistaken, when his attention was first called to the subject, 18 months after the accident, in stating that the same identical sheet, with the knot in the same identical place, was still in use, or that the witnesses from the steamer were mistaken or untruthful in stating that the green light which came into view after the flash light was "dim," "dull," "very dim," or "glimmering"? We are inclined to the opinion that the captain is in error, since, even if the sheet were the same, the position of the knot might well have been changed, and he not know it. And if the evi-

dence of those on the steamer is to be credited,—and, in our opinion, it should be,—a temporary obscuration of the green light by the forestay sail is the only reasonable way to account for their failure to see the Daylight sooner.

The decrees of the district court are affirmed, with costs.