## THE LIVINGSTONE.

(District Court, N. D. New York. May 30, 1898.)

COLLISION—FAILURE TO HEED SIGNALS—INSUFFICIENT LIGHTS.

A steamer on Lake Erie, in the open lake, on approaching another steamer head on, at night. gave the proper signal for passing port to port at the same time porting her helm. The second steamer, being unable to make out any red light on the first, supposed the latter would pass to starboard, and starboarded her own helm. When the vessels were only a quarter of a mile apart, and visible to each other without lights, the second put her helm hard a-starboard, thus bringing them into collision. *Held,* that the second vessel was in fault for making her last change of helm to starboard, when she should have ported; but that the first was also in fault for not displaying proper lights, not keeping a proper lookout, and not slackening speed.

The libel was filed by the Lackawanna Transportation Company and the Delaware, Lackawanna & Western Railroad Company against the steam propeller Livingstone to recover damages for the loss of the steam propeller Grand Traverse and her cargo owned by the libelants.

87 F.—49

The libel alleges that the collision, which resulted in the sinking of the Grand Traverse and her cargo, occurred at half past 5 on the morning of October 19, 1896, near Colchester Light at the western end of Lake Erie. The faults which the libel avers against the Livingstone are, first, insufficient lights; second, failure to heed the signals of the Grand Traverse; third, failure to stop and reverse; and, fourth, starboarding when the vessels were only a quarter of a mile apart. The libel demands judgment for $50,000, the value of the Grand Traverse, and for $15,000, the value of her cargo.

The Michigan Navigation Company, the owner of the Livingstone, filed an answer denying all allegations of negligence on the part of the Livingstone and alleging that the Grand Traverse was at fault in the following particulars: First, she did not carry and display good and sufficient lights and at no time showed a red light on her port side; second, she had no proper or sufficient lookout; third, the persons composing her watch were incompetent and inattentive; fourth, she did not keep her course but negligently ported when danger of collision was imminent; and, fifth, she did not stop and reverse. The answer alleges that the Livingstone suffered damage in the sum of $6,850, which constitutes a just and equitable claim against the owners of the Grand Traverse.

The Indemnity Mutual Insurance Company was the insurer of the coal lost upon the Grand Traverse, and, having paid the loss to the Delaware, Lackawanna & Western Railroad Company, the owner, was subrogated to the latter's rights and intervened as libelant to protect this interest.

At the time of the collision the act of congress passed February 8, 1895 (28 Stat. .645), was in force. The act provides "that the following rules for preventing collisions shall be followed in the navigation of all public and private vessels of the United States upon the Great Lakes and their connecting and tributary waters as far east as Montreal."

These rules, so far as applicable to the present controversy, are as follows:

Rule third provides that a steam vessel when under way shall carry:

"(a) On or in front of the foremast * * * at a height above the hull not less than" the beam of such vessel "a bright white light so constructed as to show an unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the vessel, namely, from right ahead to two points abaft the beam on either side, and of such character as to be visible at a distance of at least five miles.

"(b) On the starboard side, a green light, so constructed as to throw an unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side, and of such a character as to be visible at a distance of at least two miles."

The rule also provides for a similar red light on the port side, and continues:

"(d) The said green and red lights shall be fitted with inboard screens projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bow.

. "(e) A steamer over one hundred and fifty feet register length shall also carry when under way an additional bright light similar in construction to that mentioned in subdivision (a), so fixed as to throw the light all around the horizon and of such character as to be visible at a distance of at least three miles. Such additional light shall be placed in line with the keel at least fifteen feet higher from the deck and more than seventy-five feet abaft the light mentioned in subdivision (a)."

The steering and sailing rules applicable are as follows:

"Rule 17. When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision each shall alter her course to starboard, so that each shall pass on the port side of the other."

"Rule 23. In all weathers every steam vessel under way in taking any course authorized or required by these rules shall indicate that course by the following signals on her whistle, to be accompanied whenever required by corresponding alteration of her helm; and every steam vessel receiving a signal from another shall promptly respond with the same signal or, as provided in rule twenty-six: One blast to mean, 'I am directing my course

to starboard.' Two blasts to mean, 'I am directing my course to port.' But the giving or answering signals by a vessel required to keep her course shall not vary the duties and obligations of the respective vessels."

"Rule 26. If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse.

"Rule 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger.

"Rule 28. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of a neglect of any precaution which may be required by the ordinary practice of seamen, or of the special circumstances of the case."

The rules of the board of supervising inspectors in force at the time of the accident, which are applicable, are as follows:

"Rule 1. When steamers are approaching each other 'head and head,' or nearly so, it shall be the duty of each steamer to pass to the right, or port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle, and thereupon such steamers shall pass to the right or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left, or on the starboard side of each other.

"Note. In the night, steamers will be considered as meeting 'head and head' so long as both the colored lights of each are in view of the other."

"Rule 3. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered, and understood, or until the vessels shall have passed each other.

"Vessels approaching each other from opposite directions are forbidden to use what has become technically known among pilots as 'cross signals'— that is, answering one whistle with two, and answering two whistles with one. In all cases, and under all circumstances, the pilot receiving either of the whistle signals provided in the rules, which for any reason he deems injudicious to comply with, instead of answering with a cross signal, must at once observe the provisions of this rule."

"Rule 5. The signals, by the blowing of the steam whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting 'head and head,' or nearly so, but at all times when passing or meeting at a distance within a half mile of each other, and whether passing to starboard or port.

"Note. The whistle signals of the above situations must be given in all cases, except as qualified by rule 3, Pilot Rules.

"The manner of fixing the colored lights should be particularly attended to. They will require to be fitted each with a screen, of wood or canvass, on

the inboard side, and close to the light, in order to prevent both being seen at the same moment from any direction but that of right ahead to two points abaft the beam.

"This is important, for without the screens any plan of bow light would be ineffectual as a means of indicating the direction of steering. This will be readily understood by a reference to the preceding illustrations, where it will appear evident that in any situation in which two vessels may approach each other in the dark the colored lights will instantly indicate to both the relative course of each; that is, each will know whether the other is approaching directly, or crossing the bows either to starboard or port.

"This intimation, with the signals by whistle, as provided, is all that is required to enable vessels to pass each other in the darkest night with almost equal safety as in broad day."

Allusion was made at the argument and in the briefs to the steering and sailing rules of the dominion of Canada. It is not deemed important or proper to refer to these rules, first, because both the Livingstone and Grand Traverse were vessels of the United States and, therefore, governed by the act referred to, which is applicable to "all public and private vessels of the United States upon the Great Lakes;" second, because the Canadian rules have not been introduced in evidence and the court cannot take judicial notice of them; and, third, because there is no positive proof that the collision occurred in Canadian waters. The New York, 27 C. C. A. 154, 82 Fed. 819.

Harvey D. Goulder and Franklin D. Locke, for libelants.

F. H. Canfield, C. E. Kremer, and Harvey L. Brown, for respondent.

John C. Shaw, for intervener.

COXE, District Judge (after stating the facts as above). The collision between the Livingstone and the Grand Traverse occurred about half past 5 on the morning of October 19, 1896, when the steamers were on Lake Erie about a mile northwest of Colchester Light, Ontario. The Traverse, a propeller 182 feet long and 33 feet beam, loaded with coal and merchandise, was proceeding up the lake on a voyage from Buffalo to Green Bay, Wis. Her course was W. by N. ¾ N. Her speed was about 8½ miles an hour. The Livingstone, a propeller 280 feet in length and about 38 feet beam, loaded with corn, was proceeding down the lake on a voyage from Chicago to Buffalo. Her course was E. by S. ½ S. Her speed was about 10½ miles an hour. The two vessels were thus on substantially opposite courses. The wind was blowing fresh from the west. Though dark at the time of the collision it was clear and objects could be seen at a considerable distance. It was almost daylight. About half a mile ahead of the Livingstone was the Peshtigo, a propeller smaller and slower than the Livingstone, bound down the lake on substantially the same course. Just prior to the collision she passed the Traverse about a quarter of a mile to the northward. The members of her crew on watch at the time heard the signals given by the Traverse and saw the vessels when they came together. The collision occurred in the open lake, with plenty of room in which to maneuver, and with nothing in the condition of the wind or water to render navigation difficult. It must have been the result, therefore, of gross carelessness on the part of one or both of the colliding vessels. Indeed, the circumstances are almost sufficient to create a presumption of negligence on the part of both vessels. A collision so absolutely indefensible cannot easily be explained upon the theory that but one vessel was responsible. The problem cannot be satisfactorily worked out upon such an hypothesis.

No matter how gross the fault of one, an accident of this character could hardly have occurred without the concurring carelessness of the other. Human beings are not ordinarily so constructed that a single brain is capable of evolving such an over-production of stupidity. The court is bound to assume that both vessels were manned by men of ordinary experience and prudence. Upon the theory that one was wholly free from fault it is necessary to assume that the crew of the other were either intoxicated or insane. "The burden of proof is upon each vessel to establish fault on the part of the other." The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149.

## The Livingstone.

When the vessels first sighted each other they were about four miles distant. Their masthead lights were first seen. They were then meeting nearly end on and rule 17 became applicable. When about a mile and a half distant the Traverse saw the red and green lights of the Livingstone and blew one blast, as required by rule 23, to indicate that she was going to the right. She ported half a point. This was correct seamanship. The Livingstone did not answer this signal and continued on her course.

The first mate of the Livingstone, who had charge of her navigation at the time, testifies that he did not hear this signal, in fact, no one on the Livingstone heard it, if the testimony of her crew is to be accepted. There is nothing at all improbable in this story. The whistle of the Traverse was clogged with water. Her mate testifies that he blew an unusually long time before he could get a distinct response and as the wind was blowing the sound directly away from the Livingstone it is not surprising that it was not heard.

When the vessels were from three-quarters of a mile to a mile apart the Traverse seeing, at that time, only the range and red light of the Livingstone, repeated the signal and again ported half a point. There was no response from the Livingstone. When the distance had been reduced to a quarter of a mile the Traverse blew a third signal of one blast and ported a third time. This signal was heard by the Livingstone, but still there was no answer.

Assuming the Traverse to be guilty of all the faults charged against her what was the situation at the time the third signal was given? The vessels were then about a quarter of a mile apart, each could be seen by the other without the aid of lights. The Livingstone knew that the Traverse was directing her course to starboard. She knew it from the signal and it was perfectly obvious without the signal. The mate of the Livingstone said, "She seemed to put her wheel hard a-port and come right across our bow." What then was the manifest duty to the Livingstone? There can be no doubt that she should have ported also. Even had she kept her course there could have been no danger. There was but one thing possible for the Livingstone to do at this time to bring the boats into collision, namely, to starboard, and this was the one thing she did do. The proof establishes this proposition beyond a doubt. The reasons which lead to this conclusion are as follows:

First. The counsel for the Livingstone produced at the argument a carefully prepared diagram showing the course of the vessels from the time when the first signal was given, when they were distant a mile and a half. This chart shows that the Livingstone took a sharp swing to port when the last signal was given from the Traverse and when, as all concede, had she held her course or directed it to starboard the accident would not have occurred. In short, the chart shows that after the third signal the respondent's theory of the disaster agrees with that of the libelants. If the Livingstone had not starboarded at this supreme moment she would have passed the Traverse without difficulty.

Second. The wheelsman of the Livingstone testifies that pursuant to an order from the mate, who was then navigating the Livingstone, he put her wheel hard a-starboard. This was either just before or just after the last signal from the Traverse. He is corroborated by the mate of the Peshtigo, who says that after the third signal he saw the Traverse "swinging to the northward on a port wheel and the Livingstone swinging to the northward on a starboard wheel, showing both lights, red and green."

Third. It appears that when the men from the Traverse were taken aboard the Livingstone they overheard an acrimonious dispute between the mate and wheelsman in which the latter maintained that he was ordered to put the wheel a-starboard. This was denied by the mate, but the wheelsman admits that the conversation occurred substantially as narrated by the libelants' witnesses, though he disagrees with them as to the time and place. Of course it is immaterial whether the error was that of the mate or wheelsman. The wheelsman did starboard. If he were ordered to port the mistake was his. If the order was to starboard and he followed it, as he insists, the mistake was that of the mate. In either event the Livingstone is liable.

Fourth. The wheel was found to be hard a-starboard after the accident. This is established by the positive testimony of the wheelsman who says that he put the helm hard a-starboard and when the master came on deck after the collision he told him what had been done with the wheel and the master thereupon felt of the wheel and found it to be in that position. This testimony is uncontradicted.

For this obvious fault of starboarding when she should have ported the Livingstone must be condemned.

### The Grand Traverse.

The principal accusations against the Traverse are that she displayed no red light and no range light on her mizzen mast or main mast, that she had no lookout and that she did not slacken her speed when risk of collision became apparent.

The last two propositions are conceded as matter of fact. The regular wheelsman was sent aft just prior to the collision to examine the log, and the lookout, who had shipped the day before as a deck hand, was put at the wheel, so that the navigation of the Traverse was solely in charge of the mate without assistance from

any one. It is also an undisputed fact that the Traverse was not reversed and no effort was made at any time to slacken her speed.

The first proposition presents an interesting question of fact. Did the Traverse have the proper lights? She insists that all her lights were burning. On the other hand, those on board the Livingstone testify that they saw only her masthead light and her green light. Upon this question the court is inclined to the opinion that the testimony from the crew of the Livingstone is entitled to greater weight than that from the Traverse.

No one who has stood on the bridge of a steamer at night when she is approaching another steamer can doubt that the attention of each is directed intently upon the other. At such a time the gaze of the lookout is straight ahead. He does not turn about and inspect his own vessel. He is watching the approaching lights, not his own. The truth of this suggestion has frequently been recognized by the courts. In The Westfield, 38 Fed. 366, the court says:

"Where competent officers are in their places, attentive to their duties, and navigating their vessel according to what can be seen, their testimony that no light was seen, which ought to have been seen and must have been seen if properly burning, is entitled to superior credit, if their evidence is not outweighed by other circumstances."

In The Monmouthshire, 44 Fed. 697, the same court holds that:

"When several persons on watch, apparently attentive to their duties, can see no light during such a considerable period, when it ought to be seen, the defect will be ascribed to the other vessel, even when the precise reason why the light is not seen does not appear."

See, also, to the same effect, The Drew, 35 Fed. 789; The Narragansett, 11 Fed. 918; The Royal Arch, 22 Fed. 457; The Isaac Bell, 9 Fed. 842; The Johanne Auguste, 21 Fed. 134; La Champagne, 8 C. C. A. 624, 60 Fed. 299; The Daylight, 20 C. C. A. 81, 73 Fed. 878; The General, 82 Fed. 830; The Parker, 18 C. C. A. 406, 71 Fed. 989; The Mary Lord, 26 Fed. 862.

Bearing this rule in mind it cannot be doubted that the absence of proper lights on the Traverse has been sufficiently established. Only one witness testifies that her red light was burning at the time of the collision. This was the wheelsman who had been sent aft to examine the log and who returned about two minutes before the collision. He says that he turned on the forecastle and "saw the port light and masthead light and after light. The port light was burning bright red, of course." The improbability that at such a fearsome moment with the towering bow of the Livingstone plunging towards him, when life and death were in the balance, he should turn his back to the approaching peril and proceed calmly to take an inventory of the steamer's lights must be obvious without further comment.

Other witnesses on the Traverse report the lights burning at various times during the night and there is, of course, a presumption that they continued to burn. This presumption is, however, overthrown by the other evidence.

The stern light was in such a condition that it could be seen for a short distance only. After the collision, the shock being sufficient

to extinguish all the lights on the Traverse, the lantern of the stern light was found to be badly smoked and blackened so that even if the light had been burning it would have been of little practical use. The green light was taken aboard the Livingstone, but the port light, if in its screen at all, was not rescued. Indeed, it is not easy to determine the fate of the port light after the collision. Appropriately enough its history seems lost in obscurity.

On the other hand, the witnesses for the Livingstone are unanimous and positive in saying that at no time did they see any lights on the Traverse but the masthead light and green light. Their testimony is strongly corroborated by their conduct. Should the court find that the lights were all burning brightly on the Traverse the course pursued by the Livingstone cannot be accounted for upon any of the rules which govern human action. As before intimated, her watch must have been either insane or criminally negligent. On the other hand, if she saw only the green light of the Traverse she was justified in supposing, for a time at least, that a collision was impossible. That other mariners would have pursued a similar course is proved by the testimony of the mate of the Peshtigo. The mate of the Livingstone was asked why he did not give a passing signal and he answered that he did not do so because "the Traverse was showing her green light."

The mate of the Peshtigo testified as follows:

"Q. As you were approaching the Grand Traverse and at the time she blew her first whistle and before that what colored lights were you showing to her? A. Green light. Q. And she showing her green light to you? A. Yes, sir. Q. Did you think that whistle might be meant for your boat? A. No, sir. Q. Why not? A. Because she showed me no red light."

It is, of course, true that the Peshtigo was in a position where she could not have seen the red light of the Traverse had it been burning, and the testimony is quoted simply to illustrate the proposition that a prudent navigator seeing only the green light of an approaching vessel may deem himself in absolute safety and may not even feel called upon to answer signals.

The men on the Livingstone were all mariners of experience. Their employer's property not only but their own lives depended on their prudence, and yet, if the libelants' theory be correct, they continued, in the teeth of obvious peril and with an imbecility unprecedented and unique, to persist in a series of acts which no prudent navigator would tolerate for a moment. Had the Livingstone seen the port light and range lights of the Traverse, indicating that she was approaching nearly end on, and subsequently that she was turning to the right, it is impossible to believe that the Livingstone would have neither given nor answered signals and would have continued to turn to the left. The testimony is that after seeing the Traverse she starboarded a quarter of a point and soon afterwards another quarter, before the last and fatal blunder was made. To the mind of the court the strongest confirmation of the Livingstone's theory regarding lights is found in the fact that her conduct was consistent with that theory, and wholly inconsistent with the libelants' theory. She did precisely what a vessel might do seeing only the

green light of an approaching vessel, she did precisely what would not be done if both lights were seen.

The court must, therefore, reach the conclusion that the Traverse did not display the proper lights.

But it is argued by the libelants that these faults had nothing to do with the collision and that they might safely concede the existence of them all without in any way jeoparding the libelants' right to recover their entire loss. So that the following proposition is presented: A collision at night on the broad waters of Lake Erie. The vessels see each other when four miles distant. When about a quarter of a mile apart one of them makes the blunder of starboarding when she should have ported. The other has no lookout, no port light and no stern light and does not slacken her speed. Can the latter be held free from fault in these circumstances?

The law applicable to this situation is forcibly stated in The Conoho, 24 Fed. 758. Speaking of the law as to lights the court says:

"The strict observance of these rules is necessary to the safety of navigation. By their observance the navigation of steamers at night is rendered as safe as it is by day. * * * These two sorts of lights (range lights) are probably more important in narrow channels than the red and white lights. They are both essential. It is for this reason that every steamer navigating narrow waters at night is required to have these lights up. If a steamer has them not it is in fault;, it is grossly in fault. It takes the risk and responsibility of whatever may happen when they are not up. The burden of proof is upon the steamer to show that they were up. The proof must be positive. It must not be a matter of inference. These lights must be shown to have been up at the time of the collision and long enough during the moments just previously to have permitted the approaching vessel to make the maneuvers proper for avoiding a collision. There can be no safe navigation of our inland waters by steamers at night unless the master of each steamer knows that these lights are up at every moment while he is in motion. What I said in the case of The Oliver, 22 Fed. 848, I repeat with emphasis and enlargement: The law as to lights is imperative. It must be obeyed. It must be effectively obeyed. Obedience to the requirements of the law must be certain and unremitted. The master, or officer in charge, must know that the lights are continually up. Conjecture will not do. If he does not look to it himself he must have a lookout on deck, not only to keep the lights constantly burning. but to be able to say positively, in the event of a collision, that they were up before and at the time of it. The courts must not be driven to the necessity of fishing for the truth in the uncertain and conflicting testimony of the seamen of rival crews."

The rule as to the necessity for a competent lookout is thus stated by the supreme court in The Genesee Chief, 12 How. 443, 463:

"It is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout besides the helmsman. It is impossible for him to steer the vessel and keep the proper watch in his wheel house. * * * And wherever a collision happens with a sailing vessel, and it appears that there was no proper lookout on board the steamboat but the helmsman, or that such lookout was not stationed in a proper place, or not actually and vigilantly employed in his duty, it must be regarded as prima facie evidence that it was occasioned by her fault."

This rule has been uniformly followed since in all the federal courts. The New York, 18 How. 223; The Ottawa, 3 Wall. 268; Chamberlain v. Ward, 21 How. 548; The Tillie, 13 Blatchf. 514, Fed. Cas. No. 14,049; City of Philadelphia v. Gavagnin, 10 C. C. A. 552, 62 Fed. 617; The Myrtle, 44 Fed. 779.

The failure of the Traverse to stop and reverse would seem to be in direct contravention of rule 26, which provides that "if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse."

In Chamberlain v. Ward, supra, the court says (page 569):

"The Atlantic is chargeable with fault, because the officer of her deck did not seasonably and effectually change the course of the vessel, or slow or stop her engine, so as to avoid a collision, after he discovered the white lights of the approaching vessel. Whether his neglect to adopt these precautions, or some of them, arose from inattention or rashness, is immaterial, as, in either event, it was a culpable omission of duty, plainly required by the rules of navigation in that emergency, and one which the dictate of common prudence as well as a proper regard for the safety of his passengers should have prompted him to perform. * * * The officer of the deck admits that the speed of the steamer was not slackened at any time throughout the entire period that elapsed after he saw the white lights of the approaching vessel. On this ground we think the steamer was clearly in fault.". The Stanmore, 10 Prob. Div. 135; The Manitoba, 122 U. S. 97, 7 Sup. Ct. 1158.

It thus appears that the Traverse violated four well-known rules. It is, of course, possible that a case might arise where a vessel may be exculpated even in such circumstances, but it will not be denied that the presumptions are heavily against her and that she must show by the clearest proof that her neglect did not contribute to the disaster. It is not necessary for the respondent to prove that the failure to observe these rules caused the accident or helped to cause it or might have caused it. The libelants must prove that it did not and could not have caused or contributed to cause the accident. The fact being established that there was no lookout, no red light, no range light and no checking of speed the libelants must be condemned unless it appears that these omissions did not produce or contribute to produce the collision; and so, if the proof leaves the matter in doubt, for then the presumption against the libelants is not overcome. The Pennsylvania, 19 Wall. 126; Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264.

The argument for the libelants is based principally upon the testimony of the mate of the Livingstone. He said on cross-examination that up to the time the Livingstone blew the last whistle he could not have seen a properly screened red light on the Traverse if she were in the position indicated by him. He further testified that the one whistle heard by him gave him all the information needed, that the absence of the red light and mainmast light made no difference and that the only act he complained of on the part of the Traverse was that when about 1,500 feet away on a course which would have taken her at least 1,000 feet to starboard she blew one whistle and suddenly pulled across the Livingstone's bow.

The court is not concluded by this testimony:

First. It is based upon premises which both sides concede to be untrue. No one pretends that the Traverse was on a course a quarter of a mile to starboard of the Livingstone.

Second. The witness is not one who commends himself to the court. The libelants argue that he is unworthy of credence in other particulars.

Third. Taken in connection with the other testimony it is plain that the witness did not intend to make the broad admission asserted by the libelants.

It may be true that at the moment when the last whistle was blown the red light would have given the Livingstone no additional information. In that sense, and if confined to that period, the statement of the mate is intelligible, but if applied to the facts as they are actually proved it is absurd.

There is no doubt that when the vessels were a mile and a half away the Livingstone could have seen the red light and range lights of the Traverse if they had been in place. If they had been in place the Livingstone would have been informed as clearly as though it were broad daylight the exact direction in which the Traverse was pointing. Seeing the green light only and no range she had a right to assume that the Traverse was pointing so that she would pass far to the southward of the Livingstone. When she starboarded half a point she was going still further to the north and away from the Traverse. Instead of pointing to the southward of the Livingstone the Traverse was, in fact, pointing to the northward of her. Had the Livingstone known this her obvious course would have been to go to the right instead of to the left. The green light, therefore, told the Livingstone a falsehood of the most dangerous kind. It informed her that the Traverse was to pass starboard to starboard when, in fact, she was intending to pass port to port. In short, the fault of the Traverse put the vessels in a position of danger where the slightest fault might bring disaster, and the Livingstone furnished the coup de grâce.

A flagman who gives the wrong signal to an approaching train can hardly escape the charge of negligence by proof that the engineer had time to stop after he discovered the obstacle ahead of him on the track. A stage driver who signals that he is going to take the left hand side of the road is hardly in a position to escape entire responsibility for a collision occurring on the right hand side. If the Traverse had gone where her lights indicated she was going there could have been no collision. By her fault she made a collision possible, if not probable, which otherwise would have been impossible. It is, of course, difficult to predict what would have been the result had the Traverse had a lookout. It is possible that, having no other duties to perform, he might have discovered the Livingstone's erratic course soon enough to have caused the Traverse to change her course or to reverse or to signal danger sooner than she did. The City of Augusta, 25 C. C. A. 430, 80 Fed. 297.

Again, how is it possible to assert that the failure to stop and reverse was not a fault? Had the Traverse slowed down the collision might have occurred, but it might not. In any event the blow would not have been so severe. The Jay Gould, 19 Fed. 765, 771. It is enough that the libelants have failed to show that their neglect in these particulars could not have contributed to the disaster. The courts should be loth to make any ruling which shall encourage shiftlessness and inattention to duty in the navigation of ships. Only in the plainest cases should the courts take the responsibility of saying

that a vessel can violate the law and still be free from fault. The preservation of life and property depends upon the strict observance of these rules and those intrusted with the care of ships should un-. derstand that they must be enforced with uniform and absolute certainty. When it is distinctly understood that for carelessness in this respect no excuse will be received the discipline of our merchant marine will be improved and collisions like this will be heard of no more. It follows that there must be a division of damages and costs (The Warren, 23 Blatchf. 282, 25 Fed. 782) and a reference to compute the amount.

Although counsel on both sides must have contemplated the probability of this result they have discreetly refrained from discussing it in their briefs, each maintaining that the other vessel was solely responsible for the collision. The counsel for the intervener has submitted no brief and has expressed no opinion as to the form of the decree as to the cargo in case the damages are divided. Some interesting questions are presented in this regard, but as counsel have not been heard regarding them, their disposition is reserved until the settlement of the decree.

The attention of counsel is called to The Viola, 60 Fed. 296; The Manitoba, 122 U. S. 97, 7 Sup. Ct. 1158; The Alabama, 92 U. S. 695; The Atlas, 93 U. S. 302.