THE LANSDOWNE.

THE W. B. MORLEY.

(District Court, E. D. Michigan. October 29, 1900.)

1. COLLISION—ABSENCE OF LIGHTS—WEIGHT OF EVIDENCE.

In a suit for collision in the nighttime, where the officers on watch on one of the vessels and her lookout testify that no colored side light was visible on the other vessel, until immediately before the collision, to indicate that she was in motion, or her course, and there is nothing to indicate negligence on their part, 'and the management of their vessel was consistent with such fact, but directly contrary to the navigation rules and the practice of good seamanship if such light were seen, their testimony is entitled to greater weight than that of casual observers who had no interest in the matter.

2. SAME—FAILURE TO OBSERVE RULES—PRESUMPTION OF FAULT.

Under the decisions of both English and American courts, where a vessel has disregarded a rule of navigation, it is incumbent on her to show, in case of collision, that the violation of the statute not only did not contribute to the collision, but could not have done so.

3. SAME—STEAMERS CROSSING—EVIDENCE CONSIDERED.

A collision which occurred in the nighttime on the Canadian side of the Detroit river, between a steam ferryboat on her way down from Windsor to Detroit and a steamer passing up the river, held to have been due solely to the fault of the ferryboat in failing to comply with the Canadian navigation rules as to the position and character of her bright lights, or to signal when within sight of the other vessel, as required by such rules, and, chiefly, in failing to display her red port light until immediately before the collision. She was a double-ended vessel, and carried two sets of colored lights, which closed by metal screens; the custom being, when leaving her slip, for the watchman to close the lights on the end which was, for the time being, the stern, and open the others. The weight of evidence tended to show that on this occasion the port light was either not opened until the vessels were near together, or that it was only partially opened, so that it could be seen but a short distance; in consequence of which, in connection with her failure to signal, and the numerous lights in the city behind her, the officers and lookout of the other vessel were unable to make her out until near, and then supposed her to be stationary, until too late to avoid the collision.

4. SAME—CONTRIBUTORY FAULT.

The other vessel was not guilty of contributory fault in passing up within 600 or 700 feet of the shore, it appearing that she was seen by the ferryboat when half a mile distant, nor in failing to sooner signal under the circumstances shown, nor because, when a few lengths distant, she signaled her intention to pass to port, which was contrary to the rules when a vessel was approaching on her starboard hand; since she was justified in the supposition that the object seen nearly ahead was stationary.

In Admiralty. Libel and cross libel for collision.

F. H. Canfield and H. D. Goulder, for the W. B. Morley.
John C. Shaw and Alfred Russell, for the Lansdowne.

SWAN, District Judge. About 12:30 a. m., August 6, 1899, the car ferry Lansdowne, while on her trip from the slip at Windsor for her slip at 18½ street, Detroit, came into collision with the steamer W. B. Morley, coal laden, and bound up the Detroit river. The car ferry is a registered Canadian steam vessel, 318 feet long, 41 feet beam, and at the time of the collision was fully laden with freight cars.

The Morley is an enrolled and licensed American steamer, 275 feet long, and of 2,000 tons burden, and was laden with a cargo of coal. The night was starlit, and the weather clear. The collision occurred about 600 or 700 feet from the Canadian dock line, and about abreast of a point between Church and Bruce streets, of Windsor, wholly within Canadian waters. Both vessels were so badly damaged that the Morley sank in the river before reaching the dock on the American side. The Lansdowne settled on the bottom after returning to her slip at Windsor. The regular course of the Lansdowne between her Windsor slip and that at the foot of 18½ street, Detroit, was about W. ½ S., or W. by S. The Morley's course was about E. by N. ½ N., which brought her about 600 or 700 feet from the Canadian dock line. The locality of the collision makes applicable the Canadian navigation act (as amended by the order in council of February 9, 1897), constituting chapter 79 of the Revised Statutes of Canada. The following sections of that act, which is entitled "An act respecting the navigation of Canadian waters," are relied upon as defining the obligations of the vessels. The interpretation clause of the act (section 1, par. "C") declares that:

"The expression 'steam-ship' or 'steam-boat' includes every vessel propelled wholly or in part by steam or by any machinery or power other than sails or oars;"

"Sec. 2. The following rules with respect to lights, fog signals, distress signals, steering and sailing, and rafts shall apply to all the rivers, lakes and other navigable waters within Canada, or within the jurisdiction of the Parliament thereof,—that is to say:

"Preliminary. In the following rules, * * * every vessel under steam, whether under sail or not, is to be considered a steam-vessel."

"The word 'steam-vessel' shall include any vessel propelled by machinery."

Then follow the rules concerning lights, etc., prefaced by this provision:

"The word 'visible' in this rule when applied to lights shall mean visible on a dark night with a clear atmosphere."

"Article 1. The rules concerning lights shall be complied with in all weather from sunset to sunrise, and during such time no other lights which may be mistaken for the prescribed lights shall be exhibited."

"(c) A steam-vessel when under way may carry an additional white light similar in construction to the light mentioned in subdivision (a). These two lights shall be so placed in line with the keel that one shall be at least 15 feet higher than the other, and in such a position with reference to each other that the lower light shall be forward of the upper one. The vertical distance between these lights shall be less than the horizontal distance."

"Art. 18. When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other."

This article only applies to cases where vessels are meeting end on, or nearly end on, in such a manner as to involve risk of collision; and does not apply to two vessels which must, if both keep on their respective courses, pass clear of each other. The only cases to which it does apply are when each of the two vessels is end on, or nearly end on, to the other; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own; and, by night, to cases in which vessel is in such a position as to see both the side lights of the other. It does

not apply, by day, to cases in which a vessel sees another ahead crossing her own course; or, by night, to cases where the red light of one vessel is opposed to the other, or where the green light of one vessel is opposed to the green light of the other, or when a red light without a green light or a green light without a red light is seen ahead, or when both green and red lights are seen anywhere but ahead.

"Art. 2. A steam 'vessel when under way shall carry: (a) On or in front of the foremast, or if a vessel without a foremast, then in the forepart of the vessel, at a height above the hull of not less than 20 feet, and if the breadth of the vessel exceeds 20 feet, then at a height above the hull not less than such breadth, so, however, that the light need not be carried at a greater height above the hull than 40 feet, a bright white light, so constructed as to show an unbroken light over an arc of the horizon of 20 points of the compass, so fixed as to throw the light 10 points on each side of the vessel, viz: from right ahead to 2 points abaft the beam on either side, and of such a character as to be visible at a distance of at least five miles. On the port side, a red light so constructed as to show an unbroken light over an arc of the horizon of 10 points of the compass, so fixed as to throw the light from right ahead to 2 points abaft the beam on the port side, and of such a character as to be visible at a distance of at least two miles."

A like requirement is made for the starboard light.

"The said green and red side lights shall be fitted with inboard screens projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bow."

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

This is identical with rule 18 of the White law (28 Stat. 648).

"Art. 21. Where by any of these rules one of two vessels is to keep out of the way, the other shall keep her course and speed. Note,—when, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take action as will best aid to avert the collision."

Excepting this note, this rule is, in substance, rule 20 of the White law.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

This is rule 21 of the White law.

"Art. 25. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

"Art. 27. In obeying and construing these rules, due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

This is identical with rule 27 of the White law.

"Sound Signals for Vessels in Sight of One Another.

"Art. 28. The word 'short-blast' used in this article shall mean a blast of about one second's duration. When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these

rules, shall indicate that course by the following signals on her whistle or siren, viz.: One short blast to mean: 'I am directing my course star-board.' Two short blasts to mean: 'I am directing my course to port.' Three short blasts to mean: 'My engines are going full speed astern.'

"Art. 29. Nothing in these rules shall exonerate any vessel or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

"Sec. 5. If, in any case of collision, it appears to the court before which the case is tried, that such collision was occasioned by the non-observance of any of the rules prescribed by this act, the vessel or craft by which such rules have been violated shall be deemed to be in fault; unless it can be shown to the satisfaction of the court that the circumstances of the case rendered a departure from the said rules necessary. 43 Vict. c. 29, § 6."

"Sec. 9. When foreign ships are within Canadian waters, the rules for preventing collisions prescribed by this act, and all provisions of this act relating to such rules, or otherwise, relating to collisions, shall apply to such foreign ships; and in any case arising in any such court of justice in Canada concerning matters happening within Canadian waters, foreign ships shall, so far as regards such rules and provisions, be treated as if they were British or Canadian ships. 43 Vict. c. 29, § 11."

The provisions of the White law, so called, regulating navigation on the Great Lakes and their connecting and tributary waters, which took effect March 1, 1895, and rule 2 and rule 7 of the American pilot rules for the Great Lakes and their connecting tributary waters, have also been referred to in argument. But, as the case is controlled by the Canadian statutes, they have not been considered where they differ from the foreign code. The Lansdowne, being a Canadian vessel, was subject to the law of her flag; and under its requirements, because of her beam, should have carried a bright white light 40 feet above her hull, having a range of illumination of 10 points, as required by article 2 of the Canadian statute. She carried instead the lights prescribed by rule 7 of the American pilot rules for double-ended ferryboats. These were but 32 or 33 feet above her hull. The faults charged against the Lansdowne are: (1) Failure to exhibit her lights; (2) the lack of proper officers and crew; (3) failure to maintain a lookout; (4) for not sounding a whistle at the proper time; (5) for not checking her speed or stopping when risk of collision was evident. The first three specifications of fault against the Morley are identical in substance with those made against the Lansdowne. The remaining specifications in the cross libel charge: (4) That, the vessels being on cross courses, the Morley, having the Lansdowne on her own starboard side, did not adopt timely measures to keep out of the way of the Lansdowne. (5) For attempting to force the Lansdowne out of her course, and calling upon her for an impossible maneuver in order to let the Morley cross ahead of the former when the vessels were close together. (6) For wrongfully attempting, when the vessels were in close proximity, to cross the Lansdowne's course ahead of that vessel, instead of waiting, if necessary, or porting her wheel so that she might pass on the port side of and under the Lansdowne's stern. (8) For not passing between the Lansdowne and the Canadian shore. (9) In proceeding on her adopted course up the river, close to the Canadian docks, at an excessive and dangerous speed. (10) For adopting an unusual

and dangerous course next to the Canadian docks, where her lights were liable to be hidden or confused with lights on the docks and on the shore, and at a place where ferryboats are continually putting out and crossing the river.

The Lansdowne is what is termed a double-ended ferryboat. On her main deck are two tracks, upon which, at her slips in Detroit and Windsor, cars are run over her bow proper. At her stern are bumpers at the end of each track to prevent further movement of the cars astern. When running up the river from Detroit to her Windsor slip, she proceeds bow first. On the return trip to her Detroit slip, she moves down the river stern first, under engine signals of two bells, until she has arrived at a point where her bow can be swung into the slip. She carries two sets of colored lights, and has two pilot houses, one forward and aft, set upon the bridge. The lights are placed six or seven feet outboard from each side of the pilot house, and were properly fitted with inboard screens of the full regulation size. They had, however, an additional appliance to dispense with the necessity of shifting them each trip from one end to the other of the steamer, consisting of a metallic cylindrical shield of about the same height as the light, but of greater diameter, permitting it to be revolved freely around the lights, which it inclosed. This shield had an opening somewhat larger than the lens of the lights. It was the watchman's duty, preparatory to the return trip for her slip at 18½ street, Detroit, to adjust this shield on each forward light so as to close the light, and to open the lower lights by bringing the opening of the shield in front of the lens. There was also an opening about 2½ inches in diameter through the inner side of the screen board, a few inches in front of the light, through which the gleam of the light could be seen by those in the pilot house, if the lens was either fully opened or not completely closed. The Lansdowne, while in her slip at Windsor, lay with her stern about 30 feet further out in the stream than her bow, heading about on her course to her Detroit slip. Her master, before entering the pilot house to give the starting signal, went to the outer side of the bridge, —that is, on the starboard side of the boat when she is running down stream,—and looked down the river, before giving the starting signal. From that point his range of vision was limited, and he saw no vessel coming up. Before the steamer started from her slip, the master, in accordance with his custom, went into the pilot house at the upper end of the boat. Bassett, the wheelsman, Pierce, the watchman, and Prior, the assistant wheelsman and lookout, were on the main deck at this time. The first two were handling the apron and adjusting the clamps, preparatory to moving out of the dock. When this was done, the wheelsman signaled from the main deck to the master, who then sounded two short and smothered blasts of the whistle as a signal to the assistant wheelsman, who was on the main deck at the lower end of the boat, to cast off the line. This done and reported, the master gave the signal to work the port engine. When the steamer had cleared the slip, the current had a tendency, aided by the port wheel, to swing her somewhat to starboard. There was no one in the pilot house on the down-stream end of the boat when the

port engine was started. After casting off the line, the assistant wheelsman took the wheel in that pilot house. After starting the port engine, the master of the Lansdowne went from the forward pilot house to that at the downstream end. To do this he had to walk from his station at the bell pull in the pilot house, some 12 feet, to the head of a stairway of 12 steps, which brought him to the upper deck at a point about 270 feet distant from a like stairway leading to the pilot house at the down-stream end. From the top of that stairway it is 12 feet to his post in the after pilot house, which is about 330 feet from his first position. Until his arrival there was no officer at the downstream end of the steamer, and no one in that pilot house except the assistant wheelsman, who also bore the title of lookout, but was without other nautical experience than such as could be acquired by shifting the wheel under orders, casting off the lines, and loading and unloading cars. The range of his duties and his position in the pilot house disqualified him as lookoutman. The Northern Indiana, 3 Blatchf. 104, Fed. Cas. No. 10,320; The Ottawa, 3 Wall. 273, 18 L. Ed. 165. By the time the master had reached his post in the lower pilot house, the Lansdowne had got about abreast of the ferry dock at the foot of Ouellette avenue, or a little below that point, a distance of 500 or 600 feet from her slip. At this point he started the starboard engine. At an ordinary walking gait, he must have taken a minute and a half to reach the pilot house on the down-stream end, after he rang the port engine bell. Bassett, the wheelsman, got there just before the master's arrival. The distance from the Lansdowne's slip to the place of collision is about 1,800 feet. When abreast of the ferry dock, the master saw the Morley showing green and white lights. He kept on his course without signaling her until the Lansdowne was just below the lower ferry dock at the foot of Ferry street, which is about 1,000 feet below the Lansdowne's slip, when he sounded a one-blast signal, and ordered the wheelsman to port a little. He states that, if the vessels had kept their respective courses, they would have passed in safety port to port; that his signal of one blast was answered by the Morley with two blasts in such time that, as he states, "I was in no particular uneasiness about coming together," although the vessels were then not over the length of the Landsdowne apart. Thereupon he rang the bell to stop both engines, but did not reverse, because he had not time. He states that the speed of the Lansdowne was then 4 or 5 miles an hour. The current of from $1\frac{1}{2}$ or 2 miles an hour would increase that to at least 6 miles an hour. The boats came together, the bow of the Morley penetrating the stern proper or lower end of the Lansdowne several feet at an angle of 22 deg., as estimated by the master of the Lansdowne, or, as claimed by libelants, 15 deg. The photographs of the Lansdowne and Morley taken shortly after collision tend to corroborate the libelants' estimate. The master of the Lansdowne testifies that she went straight down the river out of her slip on her usual course; that when she was opposite Ferry street he saw the lights of the Morley about 1,200 or 1,500 feet down the river, and that he had seen them from the time he was abreast the ferry dock at the foot of Ouellette avenue; that he ran a minute

and a half with her lights in view before signaling her, and that the steamers were probably only 800 or 900 feet apart when he gave the signal of one blast,—the Lansdowne being then about 600 feet out from the dock line on her usual course, and the Morley then beginning to show both her lights. The speed of the Morley, it is admitted, was about 7½ miles an hour by the land; that of the Lansdowne, with the current, probably 6 miles an hour at least. The combined speed of the vessels was therefore nearly 14 miles an hour, or about 1,200 feet per minute.

It is charged as a fault on the part of the Morley that her course was dangerously near the shore, and imperiled vessels and ferries whose track it crossed. The proofs fail to sustain this contention. The collision is in no way referable to the proximity of the Morley's course to the Canadian shore.

Two questions arise in this case which are the subject-matter of directly conflicting testimony. The master and crew of each vessel testify that their own steamer sounded the first signal. Eleven witnesses on the part of the Lansdowne are confronted upon this issue by 11 equally credible witnesses who testify as positively that the Morley's signal of two blasts was first given. It is unnecessary to determine this issue. The case must be decided upon other grounds. There is much force in the suggestion that the signals sounded by the two steamers were independent, and the evidence is satisfactory that neither steamer made any change of course because of the signals of the other. The Morley's version of the circumstances which led to the collision contradicts in every material point that given in support of the Lansdowne's case. The pivotal question in the case is that relating to the port light of the Lansdowne. The libel charges, and libelants' proofs tend to show, that when the Morley was on the described course "her watch discovered on the water, and not a great distance ahead, nearly, but somewhat inside and to the starboard of, the course of said steamer, a dark object showing no lights of any kind which were visible to the men on said steamer, and which object had not and did not give any signal or indication of being a steamer navigating. The Morley promptly sounded a signal of two blasts, indicating an intention to keep outside, whereupon the dark object, which proved to be the said car ferry Lansdowne, * * * replied with a signal of one blast, and suddenly exhibited a red light. The Morley, not having changed her course, at once stopped, and reversed her engines, and backed strong; * * * but the Lansdowne, apparently without checking her speed or stopping, * * * came on, and struck the bows of the Morley nearly stem on, and crushing them in," etc. The deck watch of the Morley was composed of the master, the mate, the lookoutman, and the wheelsman. There is no evidence assailing their competency. Their testimony is that they were giving their attention closely to the navigation of the steamer; that no light was visible on the "dark object," which proved to be the Lansdowne, no indication that it was in motion, nor was any signal given by her until after the Morley had sounded a signal of two blasts, notifying her course to port; that no change of course was made on the part of the Morley in pursuance of her signal, but

instantly, upon the Lansdowne's reply of one blast, and the simultaneous exhibition of her red light, the signal to reverse the Morley's engine and back strong was given and obeyed, and her wheel was put amidships. The testimony of the master of the Morley as to the orders to the engine in their relation to the exchange of signals is supplemented by that of the engineer, watchman, and other members of the Morley's crew, and by witnesses upon other vessels in the vicinity. On the part of the Lansdowne there are about an equal number of witnesses whose testimony is that the latter's colored and bright lights were burning brightly. The preponderance of evidence is that the Lansdowne exhibited the bright lights fore and aft, but that these had no significance to a steamer on the Morley's course, because her green light was shut out from the Morley by the Lansdowne's heading, and her red light was not opened, and because of the many like lights in the back ground upon the railroad premises and in the city of Windsor from which the bright lights of the Lansdowne would be indistinguishable unless characterized by a colored light or lights.

Section 29 of the Canadian statutes, above quoted, is decisive of the fault of the Lansdowne in failing to comply with the requirements of the Canadian statute as to the position and character of the bright lights, and is prima facie evidence, until conclusively refuted of the agency, of that violation of the statute in the collision. Both the American and English courts hold that, where a vessel has disregarded a rule of navigation, it is incumbent upon her to show, in cases of collision or other disaster, that the violation of the statute not only did not, but could not have, contributed to the collision. The Fenham, L. R. 3 P. C. 212; The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, 34 L. Ed. 398. In view of the number of lights in that neighborhood for which the lights of the Lansdowne could easily be mistaken, it is impossible to say that the breach of the statute did not contribute to this disaster. The general courses of the two vessels were intersecting at an angle of between 1 and 1¼ points until the wheel of the Lansdowne was ported after the exchange of signals. It is not claimed that the green light of the Lansdowne was at any time visible to those on the Morley. If her port light was open, and burning, it should have been visible to the Morley's watch from the time the Lansdowne left her slip. It is insisted by libelants that it was first displayed immediately after the whistles were sounded. It was one of the numerous duties of the watchman of the Lansdowne to care for, close, and open the lights. He is the only witness who testified to the manual act of opening the metallic shields upon the lights at the lower end of the boat, although the assistant wheelsman of the Lansdowne states that he incidentally saw the port light open when going to the wheel after the Lansdowne had left her slip, and when he was standing near that light for the purpose of ascertaining if the bright light was burning. As the bright light was in plain sight on his way to his post at the wheel, and before he reached the stairs leading to the bridge, upon which the lights were placed, a better reason for his visit to the port

light would have inspired more confidence in his testimony. The testimony of Capt. Firby and Bassett, the wheelsman, that they saw the gleam of the red light through the opening in the screen, will be considered hereafter. It was the watchman's duty to care for the lights, to aid in raising and lowering the apron or movable platform over which the cars were run on and off the steamer, to assist in making the steamer fast in the slip, to remain at the bow until she left the dock, to open the lights at one end of the boat and close them at the other, and to help at the wheel from slip to slip. If the Lansdowne was going to her Wabash slip at Detroit, which would be made known to her crew by two low blasts of her steam whistle, given when the loading had been completed and the apron raised, the watchman had then to close the upper lights. If she were bound to the Detroit and Milwaukee slip, three blasts of the whistle were given, and the lower lights were kept closed while the upper lights remained open. He states that he opened the lower lights "as soon as we got into the dock so we could be ready to start again. Q. How long before you left the slip on that trip was it that you opened the red and green lights on the lower end? A. Not long. Sometimes the boat gets to the lower end of the slip before I get them shut off. Q. I am speaking of this particular trip. At the lower end, how long had they been open before you left the slip? A. They had been open only the time we would take to get a load off and get a load on again. Q. Then you opened them when you came into the slip? A. Yes, sir; after we get into the slip. I help the boys to land always. Then I go straight down and open them, and have them ready to start again. Q. The lights at the down-stream end would not be open as you were going up to the slip? A. No. Q. So, I understand you had opened the lights at the lower end after you got into the dock, and you helped them get away from the dock, and shut the lights off at the after end? A. Yes, sir; and when I heard our boat's whistle, I was just going to go down the stairs, and I heard the captain give one whistle, and then I turned around, and I heard the Morley give two whistles. * * * I was then at the upper end of the boat. I was going downstairs, and I was half way on the stairs when I was thrown down [by the shock of the collision]." The deposition of this witness was taken during the hearing because of his illness. His physical condition was such as to excuse the leading form of some of the questions, and the cross-examination was humanely shortened for that reason. His testimony is ambiguous and unsatisfactory. While he states that the lights were properly opened and burning, he leaves it doubtful whether they were opened before the Lansdowne was under way. His statement that he opened them after the boat got into the dock, and shut off the upper lights after he had helped to get her away from the dock, is rather an echo to the question to which he made that answer than a recollection of the order of events, or the sequence of his services. He speaks rather to his custom than to his acts that night. The fact that he had scarcely completed the closing of the upper lights before the exchange of the signals between the steamers, given when they were less than a thousand feet apart,

strongly suggests that the closing of the upper immediately followed the opening of the lower lights. That would be the natural and probable order of his duties, for until the signal of two short whistles announcing that the steamer was bound for the Wabash slip he could not know whether it would be necessary to open the lower and close the upper lights. It is, therefore, highly improbable that he opened the lower lights until the master had notified his destination for the Wabash slip by the signal of two low whistles. Then, as he admitted, it was his duty to help get the boat away from the slip, and that was doubtless an immediate and urgent duty, taking precedence over all else. The work of opening and closing the lights was merely momentary. As he had to cover the same distance, in going from the lights of one end to those at the other, which the master traversed in going from one pilot house to the other, if he did not open the lower lights until just before he closed the upper, the Lansdowne must have been about abreast of Ferry street before she showed her port light to the Morley. If this be true, it would explain the sudden appearance of that light to those on the Morley. It is also not improbable that in the hurry of his work and the multiplicity of duties, the adjustment of the metallic shield, whenever done, was hurriedly and imperfectly made, leaving the light so obscured as to be invisible at the distance which separated the two boats before the exchange of signals. The testimony of Capt. Firby, the wheelsman Bassett, and Prior, his assistant, is that from their positions in the pilot house they saw the reflection of the lights through the opening in the screen board of each light. This, however, is entirely consistent with the fact, experimentally ascertained, that the metallic shields might nevertheless have been in such position as almost wholly to obscure the lens, except to a near observer dead ahead, and yet throw a gleam inboard through the opening. Whether the shield was improperly adjusted in the hurry of leaving the slip, or whether the duty of opening the lights was not seasonably performed, cannot positively be determined upon this record; but the proofs satisfy me that one or the other of those causes prevented the sight of the red light by the Morley's watch. The witness Pangborn, a night ferryman, who was in the rowboat just below the Ouellette avenue dock when the Lansdowne left her slip, testified to seeing her red light. This may be true, and yet it may have been invisible to vessels at a distance and to the port side, because insufficiently open. He was scarce a length from the Lansdowne when she moved out of her slip, and nearly ahead of her, between her course and the ferry dock. He had no need to note her lights, but was merely waiting for her to pass down so that he might go under her stern. Other witnesses from a car ferry a mile below the Lansdowne's slip, and one from a ferry in the C. P. R. slip near Seventeenth street, Detroit, testified to seeing the colored lights of the Lansdowne before the collision. This consists entirely with the testimony of the crew of the Morley. Powers, wheelsman on the C. P. R. ferry Michigan, claims to have seen the Lansdowne's colored lights when she was coming out of her slip at Windsor when his own steamer was half a mile below the Morley, and half way between the

Wabash and C. P. R. slip. As the Lansdowne lies in her slip and moves out of it down the river in the same line of vision to one in Powers' position, it is scarcely credible that such an observer could tell whether the vessel was at rest or in motion, at her slip or a thousand feet below it.

The great majority of the witnesses had no concern with the absence or presence of the lights. The deck watch of the Morley was charged with the duty of navigating their vessel with reference to the dangers and exigencies of navigation, which in that locality were numerous and great. They knew that ferryboats were constantly crossing in that vicinity, that the numerous lights on each side of the river increased the difficulty of distinguishing those on land from those water-borne, and the conditions peculiar to the locality called for the utmost vigilance. It must be presumed that men of their experience, familiar with the river and the exceptional hazards of its navigation, were alive to their duties, and appreciated the conditions of the locality. From a point 600 or 700 feet—nearly one-third of the width of the river from the Canadian shore—the Morley's crew was, for over half a mile at least, in a position to discern the light of an approaching vessel, whether that vessel was leaving her dock bound down, or coming from a point above. It is hard to believe that if the Lansdowne seasonably showed her port light, competent navigators would be so negligent of their duties, and so reckless of the consequences of collision, as to take no precaution, nor give any warning, but keep on at full speed until that vessel had approached within 800 or 900 feet. By rule 23 of the White law every steam vessel in taking any course authorized or required by the rules shall indicate that course by prescribed signals of her whistle, and by rule 5 of the pilot rules for the Great Lakes and their connecting and tributary waters, with both of which her master was familiar, it was the duty of the Morley to sound a passing signal to an "approaching vessel" on any course, and within half a mile distant. The Canadian statute is yet more stringent requiring the passing signal when vessels are "in sight of each other." The statutes of both countries penalize the violation of any of their provisions. While the master of the Morley had no actual knowledge of the Canadian statute, yet the instinct and training of every competent American master and the penalty of the statute would naturally prompt him to observe at least the salutary requirement of the American statute and rules. He willfully disregarded these if he knew, or might have known, before the exchange of whistles, the approach of the Lansdowne, whose port light, at least if opened, was visible to him from the time she cleared from her slip, and yet approached her at full speed without signal or precaution of any kind. Such a gross violation of law and of the dictates of common prudence is not to be presumed, but must be established by the clearest evidence. That offered in support of the charge fall short of the requirement.

On the other hand, the violation of article 28 of the Canadian statute, quoted supra, is confessed by the master of the Lansdowne in the admission that he saw the Morley's green and masthead light

from the time he was abreast of Ouellette avenue. He must have seen, during every moment of her approach, that she was navigating without reference to the Lansdowne, and was on a course which would cross the latter's, yet he sounded no signal notifying her of the presence and course of the Lansdowne until the vessels were but three lengths apart, and 40 seconds would bring them together. Not even then had he any apprehension of a collision, but put his wheel nearly hard a-port, and, without waiting for answer, kept his speed and the course until he had only time to give the stopping signals to his engines before the vessels came together.

Where reputable witnesses, whose competency and experience in their calling is not questioned, testify that no light was visible, who were in a position to see it if it was, whose interest, duty, and safety were involved in observing it, and where there is nothing to indicate negligence on their part, and a collision occurred which might easily have been avoided, and would naturally have been averted if the light had been visible and seen; when their testimony is opposed mainly by that of men having less favorable opportunities of knowledge of the fact in question, and which is quite consistent with the obscuration of a light by a cause which they were not in a position to observe; and where the testimony of one of the opposing witnesses, who was charged with the duty of opening the light, is apparently to his practice, rather than his recollection of the facts and of the time when he opened the light; and when the navigation of vessel charged with fault is shown to have been flagrantly negligent in other particulars,—the weight of evidence must be deemed to establish the light in question was either imperfectly displayed or was not seasonably shown. The Drew (D. C.) 35 Fed. 791; The Livingstone (D. C.) 87 Fed. 775; The Monmouthshire (D. C.) 44 Fed. 697.

It is argued that the vessels were on crossing courses, and therefore the Morley was at fault,—if she was the first to signal,—in announcing that she was taking her course to port; that her duty was to keep out of the way of the Lansdowne by passing under her stern. It may be remarked, in passing, that the Canadian statute does not make that course imperative. Article 19 of that Code is qualified by article 22, providing that "every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of another." It is manifest, however, that the rule and its qualification apply only to those cases where both vessels are under way, and the intersection of their courses is evident. If no light was visible to the Morley until she had given the signal of two blasts, and there was nothing to indicate that the Lansdowne was on a crossing course, she was, as to the Morley, not an "approaching" vessel, but merely a possible obstruction to be shunned,—the "dark object" which the Morley's crew described her to be. When she notified her course and character by her signal and the exhibition of her port light, the collision was inevitable; and under articles 22 and 23 the "circumstances of the case" did not admit of any other course than that adopted by the Morley. It is strong evidence of careful navigation that the master refused to take the chances of crossing ahead of the Lansdowne at

full speed after her light was displayed. It is impossible to accept the judgment of the Lansdowne's master that the vessels would have passed port to port if the Morley had kept her course. The clear preponderance of the proofs is that the Morley made no change of course, notwithstanding her signal. If her port light was seen by those on the Lansdowne, it was brought into view by the advance of the latter, and at the instant of collision.

The navigation of the Lansdowne was fraught with so many sins against the Canadian statutes, the neglect of so many precautions required by the ordinary practice of seamen, that all doubts must be resolved against her. No proper precaution was taken to ascertain the proximity of vessels before she left the dock. She moved out of her slip without a competent navigator in charge of her forward deck. Her master was her only licensed officer. She had no lookout. She did not carry the lights prescribed by the statutes of Canada. She failed to properly and seasonably display her port light. She did not seasonably sound the passing signal, although she had seen the Morley more than half a mile away. She neither slackened speed, stopped, nor reversed until a length away from the Morley, although it should have been evident to her master at the exchange of signals that collision was imminent. Were the evidence less convincing of the careful navigation of the Morley, any doubt of the propriety of her management must be given her when contrasted with the many and grievous faults of the Lansdowne. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." The City of New York, 147 U. S. 85, 13 Sup. Ct. 211, 37 L. Ed. 84.

A decree will be entered holding the Lansdowne solely in fault for the collision, dismissing the cross libel, and referring the cause to a commission to ascertain and report the damages.