## BROOKLYN FERRY CO. OF NEW YORK v. UNITED STATES.

### THE NEW YORK.

(District Court, E. D. New York. April 8, 1903.)

**1. COLLISION—STEAM VESSELS MEETING—CONFUSION OF SIGNALS.**
    A collision between the United States steamship Dolphin, which was passing up East river, within 250 or 300 feet of the Brooklyn Docks, and the ferryboat New York, crossing to Brooklyn, but at the time headed nearly downstream, *held* due to the fault of both vessels; the Dolphin being in fault for being so near the shore in violation of the harbor rules, which required her to keep as nearly as possible in the middle of the river, and for not stopping and reversing after her third signal of a single whistle was crossed, the New York then being on her port bow, and only about 600 feet distant, instead of which she assented to such signal and turned to port; the New York being in fault for not having a proper lookout, for failing to hear or answer the first two signals from the Dolphin, and for then crossing the signal, and further confusing the signals by following with a single whistle when the vessels were near together.

In Admiralty. Suit for collision.

William J. Youngs, U. S. Atty., and Thomas I. Chatfield, Asst. U. S. Atty.

Wilcox & Green (Herbert Green, of counsel), for Brooklyn Ferry Co. of New York.

THOMAS, District Judge. About 6:16 a. m., August 1, 1899, in the East river, opposite South Second or South Third streets, Brooklyn, and at a point about 300 feet from the easterly shore, the stem of the United States steamship Dolphin struck the port side of the ferryboat New York about 20 feet aft the bow. Hence the above actions. The weather was clear, and the tide had been running ebb for an hour and a half. The Dolphin was going up the river, and the New York was bound from Twenty-Third street, Manhattan, to the foot of Broadway, Brooklyn. The Dolphin was in general charge of Lieutenant Commander Southerland, and under the immediate direction of Hudson, a licensed Hell Gate and Sound pilot. The bridge is 90 feet from the stem, and on it is the pilot house, in which were Jenkins, in actual charge of the wheel, and Sabelstrom, chief quartermaster and watch. On the bridge, near the starboard outboard rail, was Lieut. Snowden, known as the executive officer, whose duty it was to supervise the execution of the orders

¶ 1. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

given by the commanding officer, and also to look out. He did not report anything between the time of sighting the Priscilla to the time of the collision. On the extreme outboard port side of the bridge was located Lieut. Kittelle, whose duty it was to act as lookout, and also to observe the engine-room dial. The commander stood on the port side of the pilot house, varying his position slightly as occasion demanded, while Hudson, the pilot, was on the starboard side, and, as he says, "dodging around backwards and forwards, two or three feet, five or six feet, where I could see." He states that one of the causes of his dodging around might have been the foremast or something forward on the forecastle deck. The evidence shows quite plainly that, while the foremast and other objects forward would intercept the view of a person standing at a particular point on the bridge, yet there was all requisite opportunity for seeing, and the New York was seen at a sufficiently early time, and continued in constant view. The commander testified that, under the conditions existing on that morning, it was not the custom to keep a lookout on the forecastle deck, as he would interrupt somewhat the view of those on the bridge, and that there was no lookout there at the time. In one respect he was in error, for Koterski had been placed on the forecastle deck as the vessel was coming up the bay, and had not been withdrawn at the time in question. When there was expectation of a collision, several other persons in the neighborhood appeared on the forecastle deck, but their presence did not embarrass seriously the view from the bridge. Koterski states that he reported the New York. On the whole evidence, it it concluded that an efficient and proper lookout was kept on the Dolphin.

The ferryboat New York was in charge of Longstreet, who acted generally as master, particularly as wheelsman and pilot, and practically as lookout, inasmuch as his attendant, Peterson, was there, to use the master's words, to "watch for me to keep alive. That is about all." And Curtis, the deckhand forward on the main deck, testified, "My duties was to look out ahead—in case there was any collision, report it to the pilot, for instance, if I know he didn't see it." It is quite evident that the New York had no systematic, efficient lookout, and that such duty centered upon the master, who was also occupied with his other duties. If Peterson acted as a lookout, it is evident that Longstreet ignored him, and Curtis seems to have had no comprehension of the duties of a lookout. That the absence of a helpful lookout contributed to the accident is quite probable.

The case presents a strange misapprehension of signals under favorable conditions. The evidence shows that the Dolphin at the earliest opportunity took her position close to the Brooklyn shore; that after passing the bridge she was forced to mid-stream by opposite vessels; that thereupon her course was lined across to the Williamsburg shore; that "when only about halfway across" she sighted the Fall River boat Priscilla coming down the stream, and exchanged a single whistle with her, and, as the lieutenant commander testified, "at this time * * * the helm of the Dolphin was very slightly astarboard, so as to bring her in on the Williamsburg side without

running into the shore." Probably the Dolphin's swing to port in adjusting herself to a course parallel to the face of the piers may have given her some appearance of an intended course to port. Her evidence quite satisfactorily shows that she blew three distinct single whistles to the New York, and that the last alone was answered by the New York with two whistles. The master of the New York states that he heard two single whistles from the Dolphin, but it is evident that he did not hear the Dolphin's first whistle. His failure to hear the first may have arisen from the fact that it was blown by the Dolphin shortly after the latter had exchanged a starboard whistle with the Priscilla, and before the Dolphin had passed that vessel. The master of the New York states that he answered the starboard whistle with a similar signal, and that after an interval, which enabled the New York to cover a third or a quarter of the distance that separated the vessels, the Dolphin sounded two whistles, which he answered with a single blast. The evidence on the part of the Dolphin is that none of her signals were answered until, when the vessels were near each other, her starboard whistle was answered by a port whistle from the New York, which the Dolphin, in turn, answered; that immediately the New York sounded a single whistle, which the Dolphin also answered.

The first question, then, is, did the New York answer the Dolphin's starboard whistle with a like signal, or did she, rather, answer by a port signal, which the Dolphin answered, or did the Dolphin initiate the port signal after she had already given the starboard signals? This is a mere question of fact, and the fact to be ascertained is which vessel first gave the port whistle. Considering the discipline, the number and quality of the persons on strict duty on the Dolphin, the probable individual intelligence of the witnesses, the opportunity and duty to see and hear, it is concluded that the Dolphin is correct in her contention that the New York initiated the port signal. This conclusion is helped by the fact that a motive is ascribable to the New York in giving a port signal, inasmuch as she desired to head to port, and, indeed, she claims she was heading to port, for the purpose of making her slip, which was at Broadway. There was no motive whatever for the Dolphin going to port, and a port signal initiated by her after her two starboard signals would be unaccountable folly. The evidence shows beyond any rational doubt that the vessels, when they sighted each other, were on each other's port hand, so that in the night the port light on each vessel would have been seen by the other. This continued until the time of the collision, except that shortly before the collision the New York probably for a short time showed her starboard light, whereupon she ported, showing her red light again. She was never on the starboard side of the Dolphin. Therefore the proper signal was the starboard whistle. The relation of the vessels to each other precluded the propriety of the New York initiating the port signal, and she was negligent for so doing.

The next important inquiry is, was the Dolphin negligent in immediately answering the signal, considering the proximity of the vessels and the contracted space for operation, or should she have stopped and backed under an alarm signal when her starboard signal

was first crossed, for there was scant room for the ferryboat, 200 feet long, and the Dolphin, some 257 feet long, to change their positions to port on an ebb tide that delayed one and swept down the other. As has been stated, up to that time the New York was at all times on the Dolphin's port bow, so that only the port lights were visible. The answer of the Dolphin was an acquiescence in the New York's attempt to cross her bows, and, while the maneuver might have been successful if each vessel had carried it forward resolutely and persistently, yet it was a hardy venture, of doubtful achievement. In any case it was in violation of the rules, and the Dolphin cannot be excused for consenting to it, unless in the emergency it was preferable to an alarm and going astern. A final starboard whistle of the New York is affirmed by the Dolphin and conceded by the New York. Whatever was done after that signal was when the vessels were in extremis, and need not be discussed. The New York had discovered that she could not do what it was perilous for either vessel to undertake, and by retreating made a probable collision a certainty. But if it be concluded that the port signals given by the Dolphin were given under the constraint of peril suddenly imposed by the New York, why did the Dolphin permit herself to be brought to such a point without having come to an understanding with the New York? The ultimate error as regards signals was in having come into close quarters with the New York without exacting a steering signal from her. The Dolphin's own evidence is that the New York was always on her port bow, heading downstream, so as to show in the night her red light, until when about six hundred feet away she swung to port, and that she was only four or five hundred feet away when she blew two whistles—the first answer that the Dolphin had received from her. The Dolphin was, as estimated by Lieutenant Commander Southerland, twenty-six or twenty-seven hundred feet away at the time of the Dolphin's first whistle, fifteen hundred feet away at the time of her second whistle, and six or seven hundred feet away at the time of the third whistle, when the New York, swinging to port, gave two whistles, with an interval of four or five hundred feet between the two vessels. According to this, the Dolphin tranquilly navigated, while two of her steering signals were unanswered, until she was in such close quarters that it seemed less hazardous to obey the cross-signal than to attempt to go back under an alarm. It must have been evident to those on the Dolphin that the navigator of the New York had not heard or that he was neglecting the Dolphin's signals, and yet the Dolphin went forward and permitted the New York to come forward on an ebb tide, and even to swing a point or so to port across the Dolphin's bow, until the vessels were only some six or seven hundred feet apart; and even then the Dolphin did not give the alarm, but waited until the New York was only four or five hundred feet away, and had blown a port signal, whereupon the Dolphin assented to the New York crossing her bow. Such navigation does not seem to merit the approval of the court. The evidence of those engaged in the direction of the Dolphin illustrates the premises and conclusion.

Sabelstrom, watch in Dolphin's pilot house, states that when the New York gave the two whistles the distance between the vessels was 600 feet, more or less, and that the New York had then swung a point and a half to port from a position one-eighth of a point on the Dolphin's port bow at the time of the Dolphin's third starboard whistle, but that the New York at no time was on the Dolphin's starboard side.

Kittelle, watch on the port side of the bridge, fixes the time between the New York's two signals and the collision at two minutes. He places the vessels 900 feet apart at the time of the Dolphin's two whistles, and states that the New York had already sheered three-quarters of a point to port when he heard the New York's two whistles. Again he says:

"When I heard the two whistles the New York was about a point and a half on our port bow, and she had already sheered some to her port hand. Q. How do you think the Dolphin bore from the New York at the time? A. I think probably the Dolphin bore one point on the New York's port bow."

Snowden, watch on the starboard end of the bridge, states that at the time of the Dolphin's third whistle the New York was headed straight down the river, and bearing about 2½ or 3 points on the Dolphin's port bow; that the New York's two whistles followed the Dolphin's third whistle "almost immediate"; the time was "two seconds"; that the vessels were 600 feet apart when the New York blew two signals. He places the collision 250 feet from the wharves. He states that the New York swung some to port before her two whistles were heard, and was then directly ahead.

Commander Southerland states that he saw the New York "half a point, possibly a little more," on the Dolphin's port bow, and that she was heading down the river, and not for her slip, and was practically opposite the Dolphin; that her starboard light might have been obscured at night; that the Dolphin would have shown her port light; that at the time of the second whistle the vessels were port to port, and only port lights would have been visible; so at the time of the third whistle. "Q. Had the bearing changed any at the time you say she blew the two whistles? A. The time was so short that one could not have noticed. Almost immediately after this she blew two whistles. * * * Q. When you saw this escape of steam, the New York, as I understand, was bearing, as nearly as you could approximate, about a point on your port bow. Is that right? A. When the two whistles were sounded from the New York, she had commenced to sheer in to the Williamsburg shore, and bore a little on the port bow. I can't say how much." He states that the New York was approximately away as follows at the following times: Dolphin's first whistle, 2,600 or 2,700 feet; Dolphin's second whistle, 1,500 feet; Dolphin's third whistle, between 600 and 700 feet; New York's two whistles, and when New York sheered to port, 400 to 500 feet.

Hudson, the pilot, states that when he first saw the New York she was heading downstream, canting towards the slip, and right ahead, and that at night he would have seen both her lights, but would have shown the Dolphin's red light; that at the time of the

third whistle the New York was not heading for her slip, but was heading downstream; that at the time of the New York's two whistles her bearing had not changed "to amount to anything." "Q. How far apart do you think the vessels were then? A. They were getting very close together. Q. Well, how far apart? A. Twice the length of the ship, maybe. Q. Twice the length of the Dolphin? A. Yes; may have—might have been more than that." The witness states that the New York followed her two whistles with a single whistle, and it is doubtful whether he intends to state that at the time the New York was heading down the stream or to port, but he does state as follows:

"Q. If things had been going as they had been before that, you would have hit him on the starboard bow, would you? A. Very near it; very near; not head on the starboard bow, but very near it, if anything. Q. So, then, the only sheer you saw on the part of the New York was a sheer which changed the collision from the starboard bow of the New York to the port bow of the New York. Is that right? A. That is just about it."

He further states in another place that the vessels would have cleared under the two whistles if the New York had not blown one and gone to starboard. Then he gave this evidence:

"Q. I want you now, at this period of the questioning, to consider the positions of the vessels, and I ask you again, do you think the Dolphin could have cleared the New York without the New York sheering to port? A. I don't know whether they could or not. I wouldn't answer it. I cannot answer that question. Q. You know she did not swing to port, do you? A. What? Q. The New York. A. I know she did swing to port. We hit her on the port bow. She swung right square to port. Q. Well, did that bring about a collision on the port bow—her swing to port? A. Yes, sir; her swing to starboard. Q. That is what I am talking about now? A. He ported his wheel—what I am speaking about. Q. Now, then, again, having gone all over this thing, you are sure that the New York did not swing to port, but only under a port helm to starboard. Is that right? If at all; that is, if she swung at all. A. Well, it is very little, if she swung to port. She swung to starboard. * * * Q. Just previously to the New York's blowing two whistles, had the New York, or had she not, sheered in to port? A. The New York? Q. Yes. A. Well, she might have, a little. It was very little, if any. We was coming along in line with one another. Q. How was the New York heading towards you just previously to her blowing two whistles? How was she heading? Was she bow on, or what? A. Very near, not quite. No; she was not quite. Q. How was she heading towards you after she had blown two whistles, and just before she blew her one whistle? Had she swung across your path at all, or not? A. Yes, she had swung some, I guess. Q. About how much? A. I cannot say for certain about it. I cannot say for certain, because I wasn't looking for the one whistle. That is the reason. You can't swear to tell that. Wasn't looking for it. He blowed his two, and we was looking for the two. Then our ship got swinging to starboard for his two whistles. After he blowed the one, then his ferryboat come towards us; then ported his wheel. Q. Had she previously swung to port at all? A. No, sir, not that I could see, or anything. It was just laying there waiting for him to blow. The ferryboat goes straight down to the slip. You could not hit him on the port bow; the starboard bow. Q. I am not talking about which way the ferryboat was going, or anything of that kind. When the boats were a short distance from each other, you blew one whistle. Correct me if I am wrong. The ferryboat blew two whistles. Now, what movement would the ferryboat make, naturally, after giving a signal of two whistles? Which way would she sheer? A. He ought to starboard his wheel. Q. Did he do that at all? A. I don't think it. It did not look like it. Q. You didn't notice any special

sheer to port, then? A. I couldn't say where it come in; no. We hit him on the port bow. He must have hard-aported his wheel about the same time."

The pilot's evidence affords precarious support for any position helpful to the Dolphin.

From the foregoing evidence, it appears that the Dolphin, swinging from the westward, took a position some two hundred and fifty or three hundred feet from the Brooklyn shore, thereupon starboarding until she had adjusted herself thereto; that she exchanged single whistles with the Priscilla, and when about twenty-six hundred feet away gave her first whistle to the New York, which she repeated when she was some fifteen hundred feet away, and repeated again when she was six or seven hundred feet away, and that, when the vessels were from four to six hundred feet apart, the New York crossed the Dolphin's starboard whistle, three times repeated; that the Dolphine concurred in a change of her proposed maneuver; and that when the vessels were in extremis each blew a starboard whistle, initiated by the New York. Longstreet, master of the New York, places the collision five hundred feet out from the piers. He states that when he first saw the Dolphin, he was just leaving the Priscilla's wake, and heading towards his slip, and that when he answered, as he claims he did, the second whistle which he heard from the Dolphin, his wheel was hard aport, and that the port helm altered his course about four points to the starboard, but did not carry him to the starboard one hundred feet. He states that when the New York gave the first one whistle in answer to the Dolphin's single whistle, the vessels were twenty-five or twenty-six hundred feet apart, and that he thereupon held his course to starboard until the New York went one-third or one-quarter the distance between the two boats; that when he answered the single whistle he was five or six hundred feet from the Williamsburg shore; that, when he had gone about one-third or one-fourth of the distance between the two boats, the Dolphin blew two whistles, and the New York answered with one; that when the Dolphin blew two whistles she was about one hundred and fifty or two hundred feet on the port side of the New York. He further states that he put his wheel hard astarboard just previous to the collision, when the vessels were one hundred feet apart. This evidence does not change the conclusion already reached.

The final inquiry relates to the proximity of the Dolphin to the Brooklyn shore. The evidence shows that she was not over 250 to 300 feet away, and that she had crossed the river to a somewhat nearer point before straightening up the river. The pilot of the Dolphin seems to have been entirely unconscious of the laws of the state of New York respecting the navigation of the river. This court has announced repeatedly that the statute must be respected. It continues to be constantly disregarded. The present facts show a gross violation of the statute. They show that the Dolphin's pilot not only did not know of the existence of the statute, but that he had no purpose, intention, or practice of observing it. The burden is upon the Dolphin to establish that the accident would have happened, had not the law been disobeyed. This burden has not been sustained.

Moreover, it clearly appears that, if the Dolphin had been in the part of the river where she belonged, there would have been no occasion for the New York to attempt to cross her bows. The New York evidently was attempting to go to her slip. Whether she was attempting to do it negligently or otherwise is of no importance as regards the Dolphin. The Dolphin was in a place where she had no right to be. She was in a place customarily used by ferryboats in making their slips. · It is not for the court to determine whether the law is wise or unwise. It exists, and should be enforced. The discussion would be quite incomplete without the following excerpt from the evidence of the pilot of the Dolphin respecting the statute of New York which requires that all steamboats passing up and down the East River "shall be navigated as near as possible in the center of the river, except in going into or out of the usual berth or landing place of such steamboats":

"Captain, you are licensed under the laws of New York, are you not? A. The United States and the state of New York; by the government. Q. Do you know a law of the state of New York which requires vessels navigating in the East river to keep in the middle of the river? A. At certain times of the tide. Q. Is there anything in the law which says it shall be done at certain times of the tide? A. No; keep a certain distance off from the docks. Q. Does the law say that you shall keep a certain distance off from the docks? A. Yes, sir. Q. What does it say in that respect? A. A reasonable distance —200 feet or more. Q. That is what the law says, is it? A. Yes; similar to that; go a reasonable distance off. Q. You were going on the theory that the law entitled you to go within 200 feet of the docks? A. Yes, sir; or somewheres near it. Q. Can you give me any reference to that law, or tell us where we can find it? A. That is rulable in New York Harbor. Q. We are talking about the law now—the statute law. A. I never read it, but it is rulable among us all. Q. You never read the statute law? A. I know that it is rulable—a certain distance off, to give anybody a chance to go inside of you."

The conclusion is that the New York was negligent in her lookout, in delaying and finally initiating a signal to steer to port when the vessels were so near together; that the Dolphin was negligent in taking her position in such close proximity to the Brooklyn shore, and in delaying until the vessels were dangerously near each other before coming to an understanding with the New York respecting their passing courses.

The damages and costs will be divided.