## THE HARTFORD.

## THE MANHATTAN.

### (District Court, S. D. New York. October 30, 1903.)

1. COLLISION—STATE RULES FOR EAST RIVER NOT AFFECTED BY NATIONAL PILOT RULES.

The state statute requiring vessels navigating the East river to keep near the middle of the river is not changed or superseded by the pilot rules established by Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2876].

**2. SAME—STEAMSHIP AND TOW—FAILURE OF TUG TO KEEP IN MIDDLE OF EAST RIVER.**

A tug with a tow held in fault for a collision between her tow and a steamship in East river on the ground that she was near the side of the river without necessity, and in violation of the statutory rule requiring all vessels to keep near the middle, and also for her failure to have a lookout.

**3. SAME—LIGHTS—EVIDENCE CONSIDERED.**

Conflicting testimony examined, and *held* to clear a steamship from the charge of fault in not observing a meeting tug with a tow in East river, in the night, in time to avoid collision with her tow, on the ground that the tug's side lights were not burning.

In Admiralty. Suit for collision.

Carpenter & Park, for libelants and the claimant of the Manhattan.
Wilcox & Green, for claimant of the Hartford.

ADAMS, District Judge. This action arose out of a collision between the libellants' barge American Eagle and the steamboat Hartford, which happened on the 17th of May, 1902, a little after 8 o'clock p. m. in the vicinity of the Brooklyn Bridge. The barge, in tow, on a hawser of about 20 fathoms, of the steam lighter Manhattan, in company with another vessel alongside of her, was proceeding to the westward and the Hartford was going, under her own steam, from old pier 24, East River, to Hartford, Connecticut. The night was dark but clear and the tide the strength of the ebb. The effect of the collision was to overturn the barge, causing the loss of her deck load of iron and the effects of the crew. The action was brought against the Hartford and the Manhattan was brought in by petition.

The collision occurred on the Brooklyn side of the river, where, on account of the ebb tide, it was necessary for the Hartford to go to get a heading up the river, but there was no necessity for the tow being there. The Manhattan was out of her proper place in the river and this was a fault on her part for which she must be held. The A. Demarest (D. C.) 25 Fed. 921; Brooklyn Ferry Co. v. United States (D. C.) 122 Fed. 696, 703.

The rule requiring vessels to keep in the middle of the East River established by state statute has not been changed by the pilot rules by Act Cong. approved June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2876], the object of the local rule being to keep vessels away from the vicinity of the piers, in order that vessels properly using the wharves, shall not be imperiled by vessels going up or down the river. The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139. And the United States statutory regulations for the prevention of collisions, especially provide (Article 30) that:

"Nothing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any harbor, river, or inland waters." Act Aug. 19, 1890, c. 802, 26 Stat. 328 [U. S. Comp. St. 1901, p. 2871].

¶ 3. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

The Manhattan was also in fault for not having a lookout.

The determination of the controversy with respect to the alleged fault of the Hartford for not observing the Manhattan and for that reason participating in the collision, turns principally upon the question whether the Manhattan, owned by the libellants, had her side lights set and burning. It was alleged on the part of the Hartford that there were no colored lights visible on the Manhattan, and that those navigating the Hartford were not aware, at first, that the tow was coming down the river but supposed, until the collision was imminent, that it was bound up the river, in the same direction as the Hartford. On the part of the Manhattan, it is alleged that her side lights were properly set and burning.

Of the many witnesses examined on behalf of the Manhattan, but few testify to the lights being set and burning before the collision, viz.: the master of the Manhattan, her deck hand, a boy on board, named Becker, and, possibly, a deck hand of the tug Annan, which was in the neighborhood and took the men off the barge after the collision. All these witnesses testified in court excepting Becker, who was not present but was examined subsequently out of court. Their general testimony is met by the testimony of five witnesses on the Hartford to the effect that they were looking carefully for lights and, while they saw the white lights of the tug and tow, no colored lights were visible. This was not an after thought, because those on the Hartford charged the Manhattan with fault in this respect within five or ten minutes after the collision, when the Manhattan, having gone down the river to pick up the barge, returned alongside the Hartford with her lights then burning. And the answer, filed shortly after the collision, specifically sets forth this alleged fault.

A careful examination of Becker's testimony, particularly the cross-examination, leads me to the conclusion that the witness should not in any respect be relied upon. It has also led me to a careful examination of the minutes of the testimony taken on the trial. When arrangements were made for the examination of the additional witness, it was upon the theory that he was a recently discovered deck hand, who was missing when the trial took place. The witness who was examined out of court, was a boy, who had been described by the master of the Manhattan as a passenger, some friend of the owners, who had just happened to come into the pilot house. Pearson, deck hand of the Manhattan, said that he saw the other deck hand put up the colored lights. The absence of this other deck hand is not sufficiently accounted for. The witness Becker testified that he put them up. He said that he was 16 years old at the time of the collision and getting $25 per month, deck hands' wages, which is, at least, doubtful. He also said he had within about a week of the trial been re-employed by the libellants at that rate of wages. These facts, with some other discordant testimony, discredit all these witnesses, and no testimony remains in support of the lights being set and burning at the time of the collision, excepting, possibly, that of the witness Gabriel, the deck hand of the Annan mentioned. His testimony was not particularly impressive. He appeared to be the only one on the Annan, who was willing to convey the impression

that he saw the lights burning at the time of the collision. He testified, on cross-examination, that he saw the lights when the Annan crossed the Manhattan's bow, which was after the collision, and it is likely that if he actually saw the lights, it was after they were lighted subsequent to the collision.

I am inclined to believe from the circumstances and the straightforward testimony from the Hartford, including that of a lookout, that the Manhattan's colored lights were not burning until after the collision, and it follows that the allegation of fault on the part of the Hartford for not seeing the Manhattan fails. The Westfield (D. C.) 38 Fed. 366; The Monmouthshire (D. C.) 44 Fed. 697; The Viola (D. C.) 59 Fed. 632; The Livingstone (D. C.) 87 Fed. 769, 775; The Lansdowne (D. C.) 105 Fed. 436.

Another allegation of fault on the part of the Hartford was, that she exchanged a signal of two whistles with the Manhattan. This she denied and her witnesses say that the only signal of such character that she gave was to a tug, towing two car floats, bound down the river on the Brooklyn side. The finding on the credibility of witnesses with respect to lights is decisive of this question also.

Libel dismissed as to the Hartford.