### THE SPARTAN PRINCE.

### THE THOMAS A. QUIGLEY.

(District Court, S. D. New York. December 9, 1903.)

1. COLLISION—STEAMSHIP AND BARGE IN TOW—STATE STATUTE REQUIRING VESSELS TO KEEP NEAR MIDDLE OF EAST RIVER.

A collision occurred in the daytime in East River, some 300 or 400 feet off the piers near the Battery, between the steamship Spartan Prince and a barge in tow on the side of the tug Quigley. The steamship was proceeding out to sea from the Brooklyn shore, intending to go between the Battery and Governor's Island, while the tug had come around from the North River, and was about to take her tow into a slip about opposite where the collision occurred. Both vessels were proceeding at slow speed. Held, that the steamship was at fault for being too near the pier, in violation of the state statute which required her to keep near the middle of the river, and also for keeping her course and speed after her erroneous signal for passing to the right was unanswered, instead of at once stopping and reversing, although the vessels were then in such close proximity that the danger was imminent; that the tug was also in fault, for not keeping a proper lookout, and in continuing her course across that of the steamship, when she should have known that it involved danger of collision.

In Admiralty. Suits for collision.

James J. Macklin, for the libellants and the Quigley.

Convers & Kirlin, for the Spartan Prince.

ADAMS, District Judge. On the 5th day of February, 1902, about 2 o'clock P. M., a collision occurred off about piers 3 and 4 in the East River, between the steamship Spartan Prince and the barge Ethel Quinn, in tow of the tug Thomas A. Quigley. William Quinn was the owner of the barge and the bailee of her cargo. The barge was sunk and the first action was brought to recover the damages suffered by him. The tug Quigley was brought in by petition of the claimant of the Spartan Prince, under the 59th Rule. William H. Flannery and others were the owners of the Quigley and the second

action was brought by them to recover the damages the tug suffered in the collision.

The Spartan Prince, a steamship of about 380 feet in length and drawing 22 feet of water, left her wharf at the foot of Pierrepont Street, Brooklyn, shortly before the accident and was proceeding to sea, at a slow rate of speed, intending to go between Governor's Island and the Battery.

The Quigley, with three barges in tow, which she had picked up at various points in the North River, was bound, through the same channel, to the space between piers 3 and 4, East River, Manhattan side, for orders. The Ethel Quinn was on the tug's starboard side and the other two barges on her port side. She was proceeding at a slow rate of speed, somewhat aided by the tide.

The collision occurred off about the place the tug and tow were bound for and about 300 or 400 feet out in the river from the end of the wharves on the Manhattan side. The steamship struck with her stem the Quinn on her starboard side near the stern. The weather was clear, the tide flood.

The principal controversy is with respect to the bearing of the vessels from each other, the steamship contending that the tug and tow were to the port of the steamship and the tug contending that the steamship bore to the tug's starboard. It is probable that both contentions are right to a degree. The steamship after leaving her Brooklyn pier, directed her course towards the Manhattan shore, thus bringing all vessels coming up the river on her port hand. She overcame this to some extent by turning down the river but never enough to change altogether the bearing of approaching vessels. The bearing of the tug was increased prior to the collision by the porting of the steamship under a supposed compliance with Rule 1, requiring vessels meeting head and head to pass to the right. It seems to me, that the rule had no application to the situation, because the vessels were not so meeting. When the steamship was first seen by the tug, the steamship bore no doubt to the starboard of the tug for a short time as the former came across the river. The situation, however, was only temporary and did not bring the starboard hand rule into operation. The steamship's theory of being bound down the river, on a course to pass between Governor's Island and the Battery, with the tug on her port hand, would place the tug near the Island. Such position is contrary to the weight of the testimony, which shows that the tug and tow were rounding the Battery. Indeed, the steamship's answer to the libel of Flannery states that the tug and tow were "observed rounding the Battery," which is inconsistent with the argument advanced on behalf of the steamship. Morever, it is extremely improbable that a tug and tow bound from the North River to a slip between piers 3 and 4 East River, would be in any such position as is contended for by the steamship.

There is no doubt that the steamship was out of her proper place in the river, in being so far on the Manhattan side. It is urged, in her justification, that she was properly on that side, under the provisions of article 25 of the Act of Congress, approved June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883], but it has recently

been held that the rule requiring vessels to keep in the middle of the East River, established by state statute, has not been changed by the act mentioned, the object of the local rule being to keep vessels away from the vicinity of the piers in order that vessels properly using the wharves, shall not be imperiled by vessels going up or down the river—Collier Brothers Lighterage & Transportation Company against the Steamboat Hartford (decided October 30th last, not yet officially reported) 125 Fed. 559. Of course, this does not require vessels navigating near the Battery to keep in the middle of the river, where it is about 3,000 feet wide and has two outlets, the Buttermilk Channel and the channel this steamship was about to take. But they must keep away from the vicinity of the wharves and slips so that vessels desiring to use them may have an unimpeded access.

According to the steamship's contention, she blew a signal of one blast to the tug and getting no reply, she continued ahead and blew another. The vessels were getting in such close proximity, no attention being apparently paid to the steamship by the tug, that it was the former's duty to stop after the first signal, instead of going ahead—The Columbia (C. C.) 25 Fed. 844, 23 Blatchf. 268—and such action, I believe, would have avoided the collision.

The steamship must be held in fault for the two reasons indicated, as well as for apparently consenting to the tug's proposed manœuvre of crossing the steamship's bow, by blowing an answering signal of two blasts to the two whistle signal of the tug. There was enough of a lapse of time between the steamship's consenting signal and a following reversing one of three blasts, for some cautionary action on the part of the tug, which, instead of taking, kept on with the expectation of succeeding in an attempt to avoid the collision in that method. The last signal of the steamship was followed by an actual stopping and reversing of her engine, which, aided by the tide, almost, if not quite, overcame her forward motion before the collision. Nevertheless, the collision occurred and the steamship cannot be exonerated because it happened principally through a forward movement by the tug.

The tug was also in fault. A vigilant lookout on her would have seen from the steamship's movements and determined from her whistles, that she, in going to her starboard, was proceeding upon a theory, which involved danger of collision, if the tug attempted to reach her destination, between piers 3 and 4. Notwithstanding the obvious danger, the tug continued her forward movement and the accident resulted. This is not a case of conflicting evidence, which the courts should, in view of the steamship's manifest faults, resolve in favor of the tug. The tug's faults are shown by her own evidence.

Decree in favor of the libellant Quinn against both vessels. Decree for Flannery et al. for half damages. Orders of reference will accompany the decrees.